878 F.2d 776
 58 USLW 2035
 Reba Williams DIXON; Dana Burroughs; Edwin B. Fruit;
Margaret Mary Kreiner, Plaintiffs-Appellants,
v.
MARYLAND STATE ADMINISTRATIVE BOARD OF ELECTION LAWS; James
W. Johnson, Jr., Margarette E. Crowder, Solomon N. Hoke,
Barbara B. Kendall, Peggy Rae Pavlat, as members of the
Board; Gene M. Raynor, as the State Administrator of
Election Laws; Baltimore City Board of Supervisors of
Elections; Carl M. Adair, Marvin L. Cheatham, Eugene Cone,
as members of the Board, Defendants-Appellees.
 No. 88-1735.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1989.
Decided June 28, 1989.
 
 Frank Montgomery Dunbaugh, Washington, D.C. (Susan Goering, Legal Director, Baltimore, Md., ACLU of Maryland, on brief), for plaintiffs-appellants.
 Jack Schwartz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Md., on brief), for defendants-appellees.
 Before WINTER, HALL and PHILLIPS, Circuit Judges.
 HARRISON L. WINTER, Circuit Judge:
 
 
 1
 In this case plaintiffs--candidates for office and voters in a Baltimore City election--challenge provisions of Maryland's general election laws. The challenged laws require that non-indigent write-in candidates for certain Baltimore City offices file certificates of candidacy and pay a filing fee of $150 in order to become "official" candidates and to have the votes cast for them reported publicly. The principal question raised is whether these restrictions impermissibly infringe on rights protected by the first and fourteenth amendments to the United States Constitution. We hold that they do.
 
 I.
 
 2
 Under Maryland law, non-indigent write-in candidates for city, state, or national office must file certificates of candidacy and pay the same filing fees as candidates whose names appear on the ballot in order to be declared "official" candidates and to have the votes cast for them reported publicly.[1] The fee for each city-wide Baltimore City office is $150.[2] Filing fees are "mandatory unless the candidate establishes his inability to pay the fee."[3] The fees for Baltimore City offices are paid to the Board of Supervisors of Elections for Baltimore City ("Board"), which in turn pays the monies received to the Mayor and City of Baltimore.[4]
 
 
 3
 Plaintiffs Reba Williams Dixon and Dana Burroughs campaigned for, respectively, the city-wide offices of Mayor of Baltimore and President of the Baltimore City Council in the 1987 Baltimore City election. Dixon and Burroughs, along with plaintiffs Edwin B. Fruit and Margaret Mary Kreiner, who cast votes for Dixon and Burroughs, reside and are registered to vote in Baltimore City. All four plaintiffs are affiliated with the Socialist Workers Party.
 
 
 4
 On July 27, 1987, Dixon and Burroughs attempted to file certificates of candidacy for the offices they sought. When they refused either to pay the required filing fees or to submit the official form "Petition to File as an Indigent Candidate," the Board rejected their certificates.[5] The next day, they filed this suit pursuant to 42 U.S.C. Sec. 1983, seeking to enjoin both the imposition of filing fees on write-in candidates and Maryland's refusal to report their votes, on the grounds that these actions violated the first and fourteenth amendments to the United States Constitution.
 
 
 5
 The district court addressed only the question of whether the statutes constituted a violation of the equal protection clause of the fourteenth amendment. See Dixon v. Maryland State Admin. Bd. of Election Laws, 686 F.Supp. 539 (D.Md.1988). The court began its inquiry by attempting to determine which level of equal protection scrutiny--rational basis or strict scrutiny--to apply in analyzing the claims of unconstitutionality. See id. at 541. Declaring that, in comparison with the amounts of the filing fees for ballot access invalidated by the United States Supreme Court in Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (invalidating mandatory ballot access fees of over $1000), and Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (invalidating a mandatory ballot access fee of over $700), the $150 write-in filing fee at issue was not "a significant obstacle to a candidate's eligibility to run or to the voters' ability to vote for him," the district court ruled that the requirement would be valid if supported by some rational basis. Dixon, 686 F.Supp. at 541. Upon examining the two interests asserted by the State--defraying the cost of write-in candidacies and discouraging frivolous or fraudulent candidacies--the district court concluded that the latter interest, at least, provided such a basis. See id. at 541-542. The district court did not analyze plaintiffs' claims under the first amendment.
 
 
 6
 The district court denied plaintiffs' application for interim relief and subsequently granted defendants' motion for summary judgment. Accordingly, Dixon and Burroughs were not made certified and official candidates, and the write-in votes cast by and for them were not officially reported.
 
 II.
 
 7
 Any write-in candidate who fails to pay Maryland's required filing fee and become certified will neither be considered an official candidate nor have reported the write-in votes cast for him. Thus, the direct impact of the fee and certification requirements falls on the candidate. It falls equally, however, on the voters who support him, because it is through their association with and their votes for the candidate that they may most effectively express their political preference. The district court concerned itself almost exclusively with the impact of the requirements on the candidate. We consider and decide the case on the basis of the effect of the regulations on the voters of Baltimore City.
 
 
 8
 If this case is examined from the standpoint of the impact of the restrictions on one who seeks to be a candidate, it is true that the Supreme Court has suggested that the right to be a candidate for public office may not be a fundamental right in and of itself and may be subject to some degree of regulation. See Bullock, 405 U.S. at 142-143, 92 S.Ct. at 855-856; Developments in the Law--Elections, 88 Harv.L.Rev. 1111, 1218 & n. 8 (1975). The Court has acknowledged, however, that "the rights of voters and the rights of candidates do not lend themselves to neat separation." Bullock, 405 U.S. at 143, 92 S.Ct. at 856. As the Court has noted, "laws that affect candidates always have at least some theoretical, correlative effect on voters." Id. Indeed, as the Court has stated emphatically, "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." Anderson v. Celebrezze, 460 U.S. 780, 786, 103 S.Ct. 1564, 1568, 75 L.Ed.2d 547 (1983) (footnote omitted).
 
 
 9
 In this connection, the Court has identified as of particular concern those laws directed at aspirants for office that tend "to limit the field of candidates from which voters might choose." Bullock, 405 U.S. at 143, 92 S.Ct. at 856; see Anderson, 460 U.S. at 786, 103 S.Ct. at 1568. The Court considers such laws suspect because they may impose restrictions on the fundamental right to vote. See Lubin, 415 U.S. at 716, 94 S.Ct. at 1320; Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Moreover, "[t]he exclusion of candidates ... burdens voters' freedom of association, because ... a candidate serves as a rallying point for like-minded citizens." Anderson, 460 U.S. at 787-788, 103 S.Ct. at 1569-1570 (footnote omitted). Accordingly, the Court has emphasized that, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." Bullock, 405 U.S. at 143, 92 S.Ct. at 856.
 
 
 10
 At the same time, however, it is important to recognize that "not all restrictions imposed by the States on candidates' eligibility ... impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." Anderson, 460 U.S. at 788, 103 S.Ct. at 1569. The Supreme Court has repeatedly stressed the legitimate interest of the States in keeping elections fair, honest, and orderly. See, e.g., id.; Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974); Bullock, 405 U.S. at 144-145, 92 S.Ct. at 856-857. As the Court has expressly noted, a "State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Anderson, 460 U.S. at 788, 103 S.Ct. at 1569 (footnote omitted).
 
 
 11
 As did the district court, we next consider the standard of review by which we are to adjudge the validity of the challenged laws. In numerous cases, the Supreme Court has endeavored to determine whether statutory restrictions on candidates are invalid under the equal protection clause of the fourteenth amendment. See, e.g., Clements v. Fashing, 457 U.S. 957, 962-965, 102 S.Ct. 2836, 2843-2844, 73 L.Ed.2d 508 (1982) (collecting cases).[6] The Supreme Court has also scrutinized candidate restrictions directly under the first and fourteenth amendments without conducting separate analyses under the equal protection clause of the latter amendment. See Anderson, supra; accord Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986).
 
 
 12
 In Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), for example, the Court held that an Ohio candidacy statement filing deadline unconstitutionally infringed on rights of voters protected under the first amendment as applied to the States via the fourteenth amendment. In so ruling, the Court articulated the following analysis for use in gauging the constitutionality of restrictions on candidacy:
 
 
 13
 Constitutional challenges to specific provisions of a State's election laws ... cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.... Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
 
 
 14
 Anderson, 460 U.S. at 789, 103 S.Ct. at 1570 (citations omitted). The Anderson Court stated that its first amendment analysis "re[lied] ... on" prior election cases applying the "fundamental rights" strand of equal protection analysis, but the Court acknowledged that it was not conducting a separate inquiry under the equal protection clause. See id. at 786 n. 7, 103 S.Ct. at 1569 n. 7.
 
 
 15
 Similarly, in its latest consideration of these issues, in Eu v. San Francisco County Democratic Central Committee, --- U.S. ----, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), the Court again applied a first amendment analysis in assessing the constitutionality of state election laws. The Court was concerned in Eu with, inter alia, the validity of a California prohibition on endorsement of or opposition to candidates in primary elections by the governing bodies of political parties. The Court recognized that the restriction had a dual effect, in that it burdened the ability of political parties and their members to disseminate ideas about candidates and issues, and it also burdened their ability to associate together. Id. at ----, 109 S.Ct. at 1017. Because the first amendment freedoms of speech and association were "directly" infringed, id. (passim ), the Court held that the restriction could "only survive constitutional scrutiny if it serve[d] a compelling governmental interest ... and [was] narrowly tailored to serve that interest." Id. at ----, 109 S.Ct. at 1019 (footnote and citations omitted). Finding no compelling governmental interest, the Court ruled the restriction invalid.
 
 
 16
 We think that Eu and Anderson, rather than the Supreme Court's equal protection precedents, dictate the applicable analysis to be employed in resolving the questions raised in this case. We therefore turn to consideration of the facts of this case in light of these precedents.
 
 III.
 
 17
 We first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff[s] seek[ ] to vindicate." Anderson, 460 U.S. at 789, 103 S.Ct. at 1570 (emphases added). Plaintiffs contend that conditioning the conferral of official status on the payment of a filing fee denies those who support write-in candidates who refuse to pay the fee an "equal opportunity to win votes," Williams, 393 U.S. at 31, 89 S.Ct. at 10, and so directly interferes with the right of these voters to associate together to advance their political beliefs. Moreover, plaintiffs argue that conditioning the reporting of votes cast for write-ins on certification, with its antecedent requirement of fee payment, drastically circumscribes each voter's right effectively to vote as he chooses.A.
 
 
 18
 We agree that the fee requirement has some detrimental effect on plaintiffs' associational rights. Maryland includes only certified candidates--who, of necessity, have paid the fee or established indigency--in its list of "official" candidates. The State publishes this list in newspapers at State expense, posts it at polling places, and makes it available to the news media and the general public in the offices of the Board. See First Set of Stipulations at 4, Dixon v. Maryland State Admin. Bd. of Election Laws, 686 F.Supp. 539 (D.Md.1988). Candidates whose names appear on the list enjoy these presumably advantageous avenues of exposure to the voting public, as well as the simple, yet undoubted, advantage of being declared official.[7] Conversely, the denial of official status to a candidate may serve to lessen the effectiveness of that candidate's campaign by making the candidate a less visible standard bearer for would-be supporters. See Anderson, 460 U.S. at 787-788, 103 S.Ct. at 1569-1570 (observing that, because "an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens," restrictions on candidates may infringe on the associational rights of voters) (footnote omitted). Thus, a candidate denied official status is indeed "denied an equal opportunity to win votes." Williams, 393 U.S. at 31, 89 S.Ct. at 10.
 
 
 19
 We next consider the magnitude of this injury. We first note that it is impossible for us to know the actual extent to which Maryland's refusal to declare candidates Dixon and Burroughs official diminished their campaign success, if at all. But, of course, our concern here is not with gauging the probability that Dixon and Burroughs would have succeeded in the advancement of their beliefs absent the State's restriction. That the popularity of a belief is not the measure of whether first amendment protection applies hardly needs stating. Denial of opportunity, not probable success, is our concern.
 
 
 20
 Mindful of this, we observe that Maryland's restriction on the candidates stopped well short of depriving them of all meaningful opportunity to advance their beliefs. Indeed, Dixon and Burroughs acknowledge that even though they were not allowed to become certified candidates, they nonetheless "engaged in a serious campaign effort." Brief of Appellants at 8, this appeal. By their own account, they were able to campaign at factory gates, university campuses, and other public places. They were also free to print and distribute leaflets and to solicit campaign contributions. See id.
 
 
 21
 Of course there was some injury to associational rights resulting from Maryland's denial of official status to these non-fee-paying write-in candidates. It is apparent, however, that this injury, however important in character, does not approach the magnitude of the injury produced by a law effecting the absolute denial of any meaningful opportunity to campaign.
 
 B.
 
 22
 The asserted injury to the right to cast an effective vote, like the asserted infringement on rights of association is, in character, of extraordinary importance. " 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.' " Williams, 393 U.S. at 31, 89 S.Ct. at 10 (footnote omitted) (quoting Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964)); see Anderson, 460 U.S. at 786-787, 103 S.Ct. at 1568-1569.
 
 
 23
 It is apodictic that a vote does not lose its constitutional significance merely because it is cast for a candidate who has little or no chance of winning. Nor do we think it loses this character if cast for a non-existent or fictional person, for surely the right to vote for the candidate of one's choice includes the right to say that no candidate is acceptable. The Supreme Court has repeatedly recognized that minor parties and their supporters seek "influence, if not always electoral success." Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 185-186, 99 S.Ct. 983, 990-991, 59 L.Ed.2d 230 (1979); see Socialist Labor Party v. Rhodes, 290 F.Supp. 983, 986-987 (S.D.Ohio 1968).
 
 
 24
 Our form of government is built upon the premise that every citizen shall have the right to engage in political expression and association.... History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society.
 
 
 25
 Sweezy v. New Hampshire, 354 U.S. 234, 250-251, 77 S.Ct. 1203, 1211-1212, 1 L.Ed.2d 1311 (1957). This attentiveness to the voices of dissident citizens flows from, and indeed is mandated by, our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).
 
 
 26
 Maryland's refusal publicly to announce the vote totals of non-certified write-in candidates squarely implicates these concerns. For, almost invariably, those who cast write-in votes are expressing support for persons other than major party candidates, whose names normally appear on the ballot. Indeed, in many cases write-in voters may be backing persons who are not even running for office, in effect expressing the comment "A plague o' both your houses."[8] Such dissident voters are no doubt aware that, as efforts to achieve the actual election of their favorites, their votes probably will be without effect. Nonetheless, these voters cast their ballots as they do, in the hope, however slim, that their votes will succeed as efforts to propagate their views, and so increase their influence.[9] Our system of government accords the expression of this hope the status of a protected right.
 
 
 27
 The State's failure to report these votes closes off this avenue for dissident expression. Like the early filing deadline invalidated in Anderson, Maryland's filing fee and certification prerequisites for the reporting of write-in votes "discriminate[ ] ... against those voters whose political preferences lie outside the existing political parties.... [S]uch restrictions threaten to reduce the diversity and competition in the marketplace of ideas." Anderson, 460 U.S. at 794, 103 S.Ct. at 1572 (citation omitted).
 
 
 28
 In our view this injury is of great magnitude. The refusal to report a vote because it is cast for a candidate who has not paid a filing fee (or demonstrated his inability to pay) and become certified completely undermines the right to vote.[10] Voters voicing their preference for such a candidate have this right of political expression taken away from them when the State refuses to make their votes public. This is no different in effect from refusing to allow them to cast their ballots in the first place.[11]
 
 IV.
 
 29
 We next "identify and evaluate the precise interests put forward by the State as justifications for the burden[s] imposed by its rule[s]." Anderson, 460 U.S. at 789, 103 S.Ct. at 1570. Our effort here is to "determine the legitimacy and strength of each of those interests [and] consider the extent to which those interests make it necessary to burden the plaintiff[s'] rights." Id.
 
 A.
 
 30
 As justifications for requiring that write-in candidates pay a filing fee in order to become certified and be declared official, defendants proffer two interests. First, they assert that the requirement is intended to help defray the cost of write-in candidacies. Second, they contend that the requirement helps to assure that only serious candidates are accorded official status.
 
 
 31
 Preservation of the public fisc is, undoubtedly, a legitimate state objective which may, under appropriate circumstances, be achieved through the charging of fees to election candidates. The Supreme Court has suggested, for example, that a State may legitimately assess a fee of a candidate for election expenses--such as the cost of entering a particular document into the public record--that arise as a result of the candidate's decision to enter a race. See Bullock, 405 U.S. at 147-148 & n. 29, 92 S.Ct. at 857-858 & n. 29. But the Court has also indicated that this legitimacy does not extend to expenses--such as the cost of counting votes--arising solely because the State has chosen to hold the election. See id. at 148-149, 92 S.Ct. at 858-859; Dixon, 686 F.Supp. at 541-542. Whether a given fee is a legitimate means of achieving this asserted interest thus depends upon the precise nature of the particular expense ostensibly covered by the fee.
 
 
 32
 Defendants have asserted that the costs of write-in candidacies "include notifying election judges of the identity of certified candidates, the counting of write-in votes, monitoring the financial statements submitted by write-in candidates and advertising their names in newspapers prior to the election." Dixon, 686 F.Supp. at 541. Of these expenses, only the cost of monitoring financial statements would appear to require incrementally greater expense with the addition of each successive candidate. The costs of advertising the candidates' names, telling the judges who the candidates are, and counting the votes should not vary greatly with changes in the number of candidates. These costs appear to be simply concomitants of the State's legislative choice to hold an election, and hence not costs that the State may charge to candidates. See Bullock, 405 U.S. at 148, 92 S.Ct. at 858.
 
 
 33
 Even assuming that these costs do vary, defendants have made no effort to demonstrate any correlation between the fee charged to write-in candidates and any particular election expense. They have presented no figures detailing actual costs. Rather, they have merely asserted that numerous expenses arise because of write-in candidacies, and that the fee helps the State to meet those expenses. This bare assertion, without more, is insufficient to show that Maryland is not requiring write-in candidates to pay election expenses properly chargeable only to taxpayers generally.
 
 
 34
 Tellingly, Maryland charges candidates both on and off the ballot--and, for that matter, both those who have participated in primaries and those who have not--the same fee. Further, in the case of demonstrated inability to pay, Maryland waives the fee. This strongly suggests that the fee does not approximate the actual expense to the State of a write-in candidate's decision to enter the race. See id. at 148 & n. 29, 92 S.Ct. at 858 & n. 29. And, most importantly, defendants have not shown, as they must, that it is necessary to raise these revenues in this manner, with its consequent burden on the associational rights of write-in voters. See id. at 149, 92 S.Ct. at 859. Absent such a showing, we must conclude that the first asserted interest cannot sustain the challenged regulation.
 
 
 35
 The second interest asserted to justify the requirement that write-in candidates pay filing fees in order to become certified--denying official recognition to fraudulent and frivolous candidates so as to minimize voter confusion and preserve the integrity of the election process--is, in some circumstances, indisputably a legitimate and weighty one. In cases involving candidates seeking positions on ballots, for example, the Supreme Court has acknowledged that weeding out spurious candidates for these reasons is a valid objective. See Lubin, 415 U.S. at 712-713, 94 S.Ct. at 1318-1319; Bullock, 405 U.S. at 145, 92 S.Ct. at 857; Jenness, 403 U.S. at 442, 91 S.Ct. at 1976; Williams, 393 U.S. at 32-34, 89 S.Ct. at 11-12.
 
 
 36
 In our view, this concern does not weigh as heavily where according official status to write-in candidates in advance of election day is concerned. In this context, where the voters have time to study the candidates to gauge their seriousness prior to the actual balloting, it would seem that room is available for a broader range of candidates representing a wider spectrum of interests. Still, some limitation on the ability of purely frivolous candidates to become "official," in order to preserve the fundamental dignity of the election process, does comport, in part, with the logic of past decisions of the Supreme Court. See Dixon, 686 F.Supp. at 542.
 
 
 37
 The use of a filing fee alone to achieve this goal is, however, plainly impermissible. The Supreme Court has "expressly rejected the validity of filing fees as the sole means of determining a candidate's 'seriousness.' " Lubin, 415 U.S. at 716, 94 S.Ct. at 1320. As the Court has stated, in discussing the propriety of assessing a ballot access fee of candidates for this purpose, "[f]iling fees, however large, do not, in and of themselves, test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office." Id. at 717, 94 S.Ct. at 1320; see Clements, 457 U.S. at 964, 102 S.Ct. at 2843; Bullock, 405 U.S. at 145-146, 92 S.Ct. at 856-857 (characterizing filing fees as "extraordinarily ill-fitted" to the goal of "weeding out spurious candidates"). The notion that the fee requirement here at issue would serve to dissuade frivolous candidates is especially hard to credit. Clearly, the requirement would bar neither a wealthy frivolous candidate, who can afford the fee, nor a destitute one, who is entitled to a waiver.
 
 
 38
 This method of achieving the State's legitimate end is, to our minds, over- and under-inclusive in comparison with the other "obvious and well-known" means of testing candidates' seriousness. Lubin, 415 U.S. at 718-719, 94 S.Ct. at 1320-1321. Accordingly, we hold that Maryland's write-in candidate filing fee is not a sufficiently narrowly drawn method of advancing the State's second asserted interest in light of the burden on rights of association that this method imposes.
 
 B.
 
 39
 We also discern no justification for the State's refusal to report votes written in for anyone other than certified, official candidates sufficient to save it from constitutional infirmity. Indeed, we can conceive of no rationale capable of supporting any other conclusion.
 
 
 40
 Economic concerns do not justify the challenged regulation. Defendants have acknowledged that, under the current system, all write-in votes are counted as a matter of course. It is only a public reporting of the vote tallies of persons who have not paid filing fees and, hence, have not become certified, that the State refuses to provide. We do not believe that the cost of adding these tallies to the existing reporting could be great. But no matter how large or small the actual cost, requiring candidates to pay it is unacceptable. The entire cost of counting and reporting the results of an election is a cost which the State, not the candidates, must bear. See Bullock, 405 U.S. at 148, 92 S.Ct. at 858.
 
 
 41
 Equally, concerns over fraud or frivolity are insufficient to support the State's regulation.[12] It is clear, as noted earlier, that Maryland's means of achieving its end is under-inclusive, as both wealthy and poor fraudulent or frivolous candidates can become certified and so have the votes cast for them reported. At the same time, the regulation nullifies the political expression embodied in votes cast for serious candidates such as plaintiffs Dixon and Burroughs, and so is overinclusive as well. In light of this, we believe that conditioning the reporting of write-in votes on payment of the fee and on candidate certification is a constitutionally unacceptable means of achieving defendants' goal of maintaining the dignity of the election process.
 
 
 42
 We emphasize that it is not merely the fee requirement with which we are concerned today. We note that, at oral argument, counsel for plaintiffs opined that a nominal fee--one of five dollars, for example--might be permissible. As to a fee charged as a precondition for certification, this may be true. But if Maryland makes the payment of such a fee a condition of reporting write-in votes, then we disagree. We are of the opinion that, used as such a condition, a requirement of certification alone unacceptably burdens the rights of voters.[13] Assuming, then, that Maryland ultimately is able to enact a write-in candidate filing fee that comports with constitutional requirements, we nonetheless can conceive of no basis whatsoever for conditioning the reporting of write-in votes either on payment of such a fee or on certification of candidates.V.
 
 
 43
 In sum, the interests asserted by defendants are insufficient to justify the serious infringement on the first amendment freedoms of write-in voters caused by Maryland's refusal to declare the candidates that they support official and by the non-reporting of their votes for non-certified candidates. We therefore hold the fee requirement challenged in this lawsuit unconstitutional. We hold also that the State may not condition the reporting of the results of write-in voting on candidate certification, whether or not accompanied by a fee.
 
 
 44
 REVERSED.
 
 
 
 [1]
 The Maryland Election Code ("Election Code," "Code") is codified in Article 33 of the Annotated Code of Maryland. See Md.Ann.Code art. 33 (1986). Section 17-5(b) of the Election Code provides, in pertinent part, that "[i]n all general elections where votes have been cast for write-in candidates for any offices by the writing-in of such candidates' names on the ballots, the board of canvassers shall transmit a statement of returns as to such write-in candidates." Id. Sec. 17-5(b). Section 17-5(d) provides for publication of these statements of returns
 "Write-in candidate" is defined in Section 1-1(a)(20) of the Code as "a person whose name will not appear on the ballot but who files a certificate of candidacy in accordance with Sec. 4D-1 of this article." Section 4D-1(b) states that "[a] write-in candidate is required to file a certificate of candidacy for election." Under Section 4D-1(c), "[t]he certificate ... shall not be filed later than 5:00 p.m. on the day preceding the day of the election for which the certificate is filed." Section 4A-6(h) of the Code provides that "[a] write-in candidate, as determined under Sec. 4D-1 of this article, is required to pay a filing fee equal to that required of a candidate for nomination to the same office sought by the write-in candidate or to the office to which he is promoted."
 As far as we are aware, Maryland is the only State that requires write-in candidates to pay filing fees.
 
 
 [2]
 See id. Sec. 4A-6(e)
 
 
 [3]
 Id. Sec. 4A-6(g)
 
 
 [4]
 See id. Sec. 4A-8(a)
 
 
 [5]
 Plaintiffs have argued that the Board administers indigency waivers too restrictively. Because they did not apply for such waivers, their argument is not properly before us and will not be considered
 
 
 [6]
 This approach has been the subject of much discussion and criticism. Many courts and commentators, including several Justices of the Supreme Court, have expressed the view that the Court's equal protection analyses in these cases have tended to be either inconsistent or obscure, or both. See, e.g., Clements, 457 U.S. at 973, 102 S.Ct. at 2849 (Stevens, J., concurring in part and concurring the judgment); Id. at 977 n. 2, 102 S.Ct. at 2849 n. 2 (Brennan, J., dissenting); Canaan v. Abdelnour, 40 Cal.3d 703, 706-708, 221 Cal.Rptr. 468, 473-475, 710 P.2d 268, 272-274 (1985); L. Tribe, American Constitutional Law Secs. 13-20, 13-21 (2d ed. 1988); Wilkinson, The Supreme Court, The Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va.L.Rev. 945, 950-954, 976 (1975); Note, Better Late Than Never: The John Anderson Cases and the Constitutionality of Filing Deadlines, 11 Hofstra L.Rev. 691, 701-703 (1983)
 
 
 [7]
 One apparent consequence of becoming an official candidate is the automatic receipt from the First Unitarian Church of Baltimore of an invitation to take part in the Church's "Candidates' Night." Plaintiffs contend that the Church's refusal to invite them to this event constitutes a limitation on their opportunity to win votes that should be ascribed to the State
 We disagree. The State did not mandate that the Church limit its debate to official candidates. The Church made that choice. We are not authorized to require the Church to change its policies in this respect. In analyzing the magnitude of the asserted injury to plaintiffs' rights of association, we do not take exclusion from any such forum into consideration.
 
 
 [8]
 W. Shakespeare, Romeo and Juliet, Act. III, scene i, line 90
 
 
 [9]
 See Choper, Consequences of Supreme Court Decisions Upholding Individual Constitutional Rights, 83 Mich.L.Rev. 1, 96-98 (1984) (describing the ameliorative impact of third-party and independent candidacies on politics in the United States)
 
 
 [10]
 We note that the Supreme Court repeatedly has emphasized the relevance of the voters' unimpeded ability to write-in in its decisions upholding other restrictions. See, e.g., Anderson, 460 U.S. at 808 n. 1, 103 S.Ct. at 1580 n. 1 (Rehnquist, J., dissenting); Storer, 415 U.S. at 736 n. 7, 94 S.Ct. at 1282 n. 7; Jenness v. Fortson, 403 U.S. 431, 434-438, 91 S.Ct. 1970, 1972-1974, 29 L.Ed.2d 554 (1971)
 
 
 [11]
 See Thompson v. Willson, 223 Ga. 370, 373, 155 S.E.2d 401, 404 (Ga.1967) (acknowledging, in striking down a state statute prohibiting write-in voting, that "refusal to count [an elector's] vote completely ignores it and is tantamount to a refusal to allow him to cast it"); Jackson v. Norris, 173 Md. 579, 599, 195 A. 576, 588 (1937) (requiring that Maryland purchase voting machines capable of accepting write-in votes in order to secure the right to cast a vote by this method)
 
 
 [12]
 In this connection, defendants appear particularly troubled by the notion that, among the write-in votes, there may be votes for fictitious personages, notably the cartoon character Donald Duck. Of course, plaintiffs seek to have reported votes not for Donald Duck, but for serious minor party candidates
 Nonetheless, we believe that such a vote might, under appropriate circumstances, be meant as serious satirical criticism of the powers that be. As previously indicated, we incline to the view that a vote for a fictitious character would be entitled to constitutional protection. Even were this not the case, however, the specter of Donald Duck as successful vote-getter does not persuade us to disregard the significant violation of protected constitutional rights that we discern here. Correcting this problem through censorship of the vote is utterly inconsistent with the principles under which our form of government operates.
 
 
 [13]
 Defendants argue that the voters' expression of political support is burdened not by the State, but by "their candidate's own failure to comply with a lawful requirement," and that "[t]he existence of voter support does not transmute a constitutional requirement into an unconstitutional one." Brief of Appellees at 17, this appeal. "[V]oters," they contend, "do not have a constitutionally protected interest in official recognition of their support of a candidate who refuses to comply with a valid prerequisite to candidacy." Id. at 4
 These arguments merely assume what they are supposed to prove: that the fee and certification requirements here in issue are "lawful," "constitutional," and "valid." And even were we to accept this flawed reasoning, we believe nonetheless that it is simply not enough to say that the candidate should have paid the fee and become certified. Under Maryland's system, a voter who writes in the name of someone who is not running, which that voter has a right to do, does not have open to him any means of getting his vote included in the official tally. Limiting him in this manner eliminates his freedom to choose as he wishes. The following words of the Maryland Court of Appeals, written over fifty years ago, speak simply and directly to this point today:
 The right to vote is the right to choose the person for whom the ballot is cast. The election is not free if the elector may not make this choice. Nor does the exercise of this right depend upon either the wisdom, the expediency, or the futility of the choice.... If the power to choose is not according to the will of the elector, but limited to a choice of the candidates whose names are printed or otherwise appear on an official ballot, the voter's choice is no longer free.
 Jackson v. Norris, 173 Md. 579, 599, 195 A. 576, 586 (Md.1937); see Developments in the Law--Elections, 88 Harv.L.Rev. 1111, 1134 n. 79 (1975). Finally, contrary to the implication of defendants' arguments, requiring that Maryland report the votes received by non-certified write-in candidates clearly is not the equivalent of requiring that unqualified candidates be allowed to take office. See Canaan v. Abdelnour, 40 Cal.3d 703, 713, 221 Cal.Rptr. 468, 478, 710 P.2d 268, 278 (1985).