[No. 27830-8-II.  Division Two.  December 31, 2002.]

DONALD W. CRISMAN, ET AL., *Appellants*, v. PIERCE COUNTY FIRE PROTECTION DISTRICT NO. 21, ET AL., *Respondents*.

*Dan M. Albertson*, for appellants.

*Arthur H. McKean* (of *Aiken, St. Louis & Siljeg, P.S.*) and *Michael A. Patterson* and *Karen Adell Kalzer* (of *Lee Smart Cook Martin & Patterson, P.S., Inc.*), for respondents.

ARMSTRONG, J. — Donald Crisman ran for Pierce County Fire Protection District 21 Commissioner against incumbent Robert Skaggs in 1997. After he lost, Crisman sued the District and its Executive Director, claiming that the director coerced district employees to campaign for Skaggs. Crisman alleged claims under Washington's Public Disclosure Act, chapter 42.17 RCW, and the federal Civil Rights Act, 42 U.S.C. § 1983. He also alleged that the District was negligent in hiring the director. The trial court granted summary judgment for the District and its director, and Crisman appeals. We affirm.

## FACTS

In 1994, the Pierce County Fire Protection District No. 21 Commissioners hired John Burgess as Fire District Executive Director. Robert Skaggs was a District 21 Commissioner and took part in Burgess' hiring. The Commissioners were aware that Burgess had been previously dismissed as Pierce County Fire Marshall, but they were apparently not aware of the details of Burgess' troubled employment history.

In 1997, Crisman ran for Fire District No. 21 Commissioner against incumbent Robert Skaggs. Skaggs defeated Crisman.

During the election, Crisman filed a complaint with the Washington Public Disclosure Commission (PDC), alleging that Burgess and the District used staff to work on Skaggs' campaign. The PDC dismissed the complaint, concluding that Burgess and other employees had been campaigning on their own time, out of uniform, and did not use district facilities. But in a later internal review, the District found that Burgess had intimidated and coerced district employees to campaign on Skaggs' behalf.

In this action, Crisman seeks damages for negligent and intentional infliction of emotional distress, the tort of outrage, denial of civil rights, and other tortious conduct.

ANALYSIS

I. Negligent Hiring Claim

We review a summary judgment de novo. *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993). Like the trial court, we consider all facts and reasonable inferences in the light most favorable to the nonmoving party. *Mason v. Kenyon Zero Storage*, 71 Wn. App. 5, 8-9, 856 P.2d 410 (1993). Absent a genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *Condor Enters., Inc. v. Boise Cascade Corp.*, 71 Wn. App. 48, 54, 856 P.2d 713 (1993). Summary judgment is proper "only if reasonable persons could reach only one conclusion from all of the evidence." *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

██ An employer may be liable for harm caused by an incompetent or unfit employee if (1) the employer knew, or in the exercise of ordinary care, should have known that the employee was unfit and (2) retaining the employee was a proximate cause of the plaintiff's injury. *Carlsen v. Wackenhut Corp.*, 73 Wn. App. 247, 252-53, 868 P.2d 882 (1994) (citing *Peck v. Siau*, 65 Wn. App. 285, 288, 827 P.2d 1108 (1992); *Guild v. Saint Martin's Coll.*, 64 Wn. App. 491, 498-99, 827 P.2d 286 (1992)). The employer's duty, however, is limited to foreseeable victims, and then only "to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others." *Betty Y. v. Al-Hellou*, 98 Wn. App. 146, 149, 988 P.2d 1031 (1999), *review denied*, 140 Wn.2d 1022 (2000) (citing *Niece v. Elmview Group Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997)).

█ In *Carlsen*, a part-time security guard at a Tacoma Dome rock concert attacked a teenage female concertgoer. *Carlsen*, 73 Wn. App. at 248-49. We held the employer could be liable for assault because (1) the assault occurred on the work premises, (2) the guard was on the job when he contacted the victim, and (3) the victim approached the

guard for information because of the guard's position. *See generally Carlsen*, 73 Wn. App at 256-57 (the victim felt comfortable asking a security guard to escort her under the bleachers). Thus, the guard's job enabled and was closely connected to the assault. *Carlsen*, 73 Wn. App at 256.

In *Betty Y.*, the employer hired a manual laborer to rehabilitate vacant apartments. *Betty Y.*, 98 Wn. App at 148. The laborer befriended a young neighborhood boy and later assaulted the boy. *Betty Y.*, 98 Wn. App. at 148. We concluded that the employer was not liable because the laborer was: (1) not hired to work with potential victims, (2) the rape did not occur on the work premises, and (3) most importantly, the job duties did not facilitate or enable the defendant to commit the rape. *Betty Y.*, 98 Wn. App. at 150.

Crisman argues that Fire District No. 21 hired Burgess without adequately investigating his background. And, according to Crisman, if the district commissioners had inquired, they would have learned that Burgess was not competent to manage district operations.

Crisman, however, fails to explain how the District's alleged misconduct proximately caused his harm. The Commissioners hired Burgess to serve as the District's chief administrative officer. As such, he was responsible for the day-to-day fire district operations. While the work situation fortuitously provided Burgess the opportunity to coerce employees into campaign activities, campaigning was not part of Burgess' duties or fire district operations. If the Commissioners had more thoroughly investigated Burgess' employment history, they would have learned that Burgess was fired from his previous job as Pierce County Fire Marshall and he had questionable management skills. But these management problems did not harm Crisman. Thus, although the District may have hired an incompetent manager, any harm to Crisman was outside the scope of Burgess' duties. Accordingly, the District did not facilitate or enable Burgess' alleged unlawful campaign activities.

## II. Washington's Public Disclosure Statutes

■ Crisman argues that he has a private cause of action under the public disclosure statutes. When no statutory cause of action exists, we will imply a cause of action when (1) the plaintiff is within the class for whose benefit the statute was enacted; (2) legislative intent, explicitly or implicitly, supports such a remedy; and (3) implying a remedy is consistent with the underlying legislative purpose. *Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990) (citing *Wash. Pub. Power Supply Sys. Sec. Litig. v. Houghton, Cluck, Coughlin & Riley*, 823 F.2d 1349, 1353 (9th Cir. 1987)).

RCW 42.17.130 reads in part:

No elective official nor any employee of his office nor any person appointed to or employed by any public office or agency may use or authorize the use of any of the facilities of a public office or agency, directly or indirectly, for the purpose of assisting a campaign for election of any person to any office or for the promotion of or opposition to any ballot proposition.

RCW 42.17.400(1) authorizes the attorney general or the prosecuting attorney to enforce the statute. The statute also allows a citizen to bring an enforcement action, but only after notice to and failure by the attorney general and the prosecuting attorney to act. The citizen's action, however, must be brought "in the name of the state . . . ." RCW 42.17.400(1).

■ Crisman urges us to find an implied private cause of action in chapter 42.17 RCW. He relies on *Bennett v. Hardy*, where the court found an implied cause of action for age discrimination under RCW 49.44.090, which prohibits discriminating against persons between the ages of 40 and 70. *Bennett*, 113 Wn.2d at 921. He also cites *Roberts v. Dudley*, 140 Wn.2d 58, 77, 993 P.2d 901 (2000), where the court found a clearly articulated public policy against worker termination based on sexual discrimination. And because of this policy, the court held that a statute defining an "employer" as having eight or more employees did not bar the

plaintiff from seeking damages for wrongful discharge based on gender discrimination against a business employing fewer than eight employees. *Roberts*, 140 Wn.2d 58.

In contrast, here the statutory public policy is:

(1) That political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided.

. . . .

(3) That the people shall be assured that the private financial dealings of their public officials, and of candidates for those offices, present no conflict of interest between the public trust and private interest.

(4) That our representative form of government is founded on a belief that those entrusted with the offices of government have nothing to fear from full public disclosure of their financial and business holdings, provided those officials deal honestly and fairly with the people.

. . . .

(6) That public confidence in government at all levels can best be sustained by assuring the people of the impartiality and honesty of the officials in all public transactions and decisions.

RCW 42.17.010.

Thus, the policy refers specifically to public disclosure of campaign finances and potential conflicts of interest. *See Cowles Publ'g Co. v. Pierce County Prosecutor's Office*, 111 Wn. App. 502, 510, 45 P.3d 620 (2002) (the basic purpose and policy of chapter 42.17 RCW is to allow public scrutiny of government, rather than to promote public scrutiny of particular individuals who are unrelated to any governmental operation). The statute also consistently refers to the "public" or "people," thereby expressing its goal of protecting the public rather than any individual candidate. Furthermore, unlike statutes that provide no remedy, chapter 42.17 RCW, authorizes enforcement by the attorney general or county prosecutor and finally by a citizen in the name of the state. RCW 42.17.400. This remedy also points to the statutory goal of public disclosure. And a private

cause of action for damages would provide no additional public disclosure over and above the statute's express remedies.

But Crisman argues that allowing a private cause of action would deter illegal use of public resources. *See Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 80-81, 1 P.3d 1148 (2000). *Tyner*, however, involved a negligent Department of Social and Health Services investigation resulting in an erroneous no-contact order between a father and his children. *Tyner*, 141 Wn.2d at 74-76. The court held that an implied tort remedy was consistent with the underlying statutory purpose of protecting children and the integrity of the family, in addition to providing greater public accountability. *Tyner*, 141 Wn.2d at 80-81. Allowing an implied tort action here would provide no greater public accountability and is not consistent with the statute's goal of public disclosure.

Crisman next argues that a state or citizen action under chapter 42.17 RCW is designed to compensate the public for election violations, while a private tort action is designed to compensate the individual victim. He contends that the statute expressly allows the court to impose civil remedies and sanctions "in addition to *any other remedies provided by law* . . . ." RCW 42.17.390 (emphasis added). This clause, according to Crisman, provides for recovery through private tort actions. Chapter 42.17 RCW sets out various enforcement procedures and provides for both legal and equitable remedies. But the various remedies RCW 42.17.390 authorize suggest that the legislature intended not to create private causes of action to enforce the code, but to give the attorney general, county prosecutor, or citizen enforcer considerable latitude in seeking the appropriate relief. We conclude that chapter 42.17 RCW does not imply a private cause of action.

### III. 42 U.S.C. § 1983 Claim

The federal Civil Rights Act, 42 U.S.C. § 1983, provides a remedy for the violation of a person's constitu-

tionally protected rights by "any person acting under color of state law." *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Accordingly, when a municipal employee commits a constitutionally impermissible tort, he or she may be found liable so long as the employee is acting in his or her official capacity. *Monell*, 436 U.S. at 690. The plaintiff in a § 1983 action must demonstrate: (1) that a person has deprived the plaintiff of a federal constitutional or statutory right and (2) that person acted under the color of state law. *Kalmas v. Wagner*, 133 Wn.2d 210, 215, 943 P.2d 1369 (1997); *Robinson v. City of Seattle*, 119 Wn.2d 34, 58, 830 P.2d 318 (1992). The municipality may be liable where it implements or executes a policy its officers officially adopted in violation of the constitution or where the alleged constitutional deprivation occurs because of government custom. *Monell*, 436 U.S. at 690-91. Personal involvement is a prerequisite for individual liability; there is no respondeat superior liability in the context of § 1983. *Kitzman-Kelley v. Warner*, 203 F.3d 454, 458 (7th Cir. 2000). And the plaintiff must prove more than a single incident to impose liability on a municipality for unconstitutional activities unless the single incident demonstrates an existing, unconstitutional municipal policy. *Lavoie v. Town of Hudson*, 740 F. Supp. 88, 92 (D.N.H. 1990).

Crisman fashions two § 1983 arguments. He claims that the Fire District and Burgess, acting under the color of state law, (1) deprived him of his First Amendment rights to free speech and association and (2) denied him his Fourteenth Amendment right to equal protection.

In support of his First Amendment claims, Crisman cites *Dixon v. Maryland State Administrative Board of Election Laws*, 878 F.2d 776 (4th Cir. 1989). There, the court considered whether Maryland could impose a $150 fee on nonindigent write-in candidates for public office. *Dixon*, 878 F.2d at 777. Several write-in candidates and their supporters argued that the statutory fee violated their First

Amendment free speech and association rights. Although agreeing that the fee had "some detrimental effect on plaintiffs' associational rights," the court rejected this challenge because the fee did not absolutely deny the candidates "any meaningful opportunity to campaign." *Dixon*, 878 F.2d at 781. But the court found the fee unconstitutional because "[v]oters voicing their preference for such a candidate have this right of political expression taken away from them when the State refuses to make their votes public." *Dixon*, 878 F.2d at 782. And this is the same as "refusing to allow them to cast their ballots in the first place." *Dixon*, 878 F.2d at 783. Finally, the court held that the fee and restrictions did not justify state concerns over costs and fraud. *Dixon*, 878 F.2d at 786.[1]

The *Dixon* court relied on *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 216, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989), and *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983). *Dixon*, 878 F.2d at 780.

In *Anderson*, the question was whether an early candidate filing deadline placed an impermissible burden on voters who wanted to support a late filing independent presidential candidate. *Anderson*, 460 U.S at 783. The Court held that the statute violated the First Amendment freedom of association rights of independent candidate supporters. *Anderson*, 460 U.S. at 793-95. And the State failed to show a compelling interest to justify the early filing deadline. *Anderson*, 460 U.S. at 796-806.

In *Eu*, the Court considered whether a state could prohibit political parties from endorsing candidates in party primaries, dictate a political party's organization and composition, limit a party chair's office term, and require the chair to rotate between the state's northern and southern residents. *Eu*, 489 U.S. at 216. The Court reasoned that free discussion about candidates for political office is no less

---

[1] See also *Phillips v. Hechler*, 120 F. Supp. 2d 587 (2000), where the court, relying on *Dixon*, invalidated a West Virginia statute that imposed a $4,000 filing fee on write-in candidates for President and Vice-President of the United States.

critical before a primary than before a general election. *Eu*, 489 U.S. at 223. Thus, the Court concluded that the primary endorsement ban hampered the parties' ability to spread their messages and hamstrung voters seeking to inform themselves about the candidates and issues. *Eu*, 489 U.S. at 223. And to impose limitations " 'on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone,' " restrained the right of association. *Eu*, 489 U.S. at 225 (quoting *Citizens Against Rent Control / Coalition for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 296, 102 S. Ct. 434, 70 L. Ed. 2d 492 (1981)). Similarly, the attempt to regulate internal party operations restricted members' associational rights. *Eu*, 489 U.S. at 233. And, as in *Anderson*, the State failed to show a compelling interest in the regulations. *Eu*, 489 U.S. at 232.

In support of his equal protection argument, Crisman cites *Gelb v. Board of Elections*, 224 F.3d 149 (2d Cir. 2000). There, an unsuccessful write-in candidate in a primary election argued that the election board violated his equal protection rights by failing to provide sample ballots containing write-in columns, furnishing absentee ballots without proper instructions, failing to provide write-in voting areas, and failing to provide pencils for write-in voting. *See Gelb*, 224 F.3d at 151. The court held that the issue depended on a question of New York state law: whether a voter in a contested primary was entitled to have write-in voting facilities in the absence of a petition for an opportunity to ballot. *Gelb*, 224 F.3d at 158. If so, according to the court, Gelb may have been denied his equal protection rights if he could also prove that the Board "engaged in arbitrary, purposeful and intentional discrimination." *Gelb*, 224 F.3d at 157.

But these cases do not support Crisman's § 1983 claim. Each case turned on a possible denial of the fundamental right to vote, not the candidate's right to participate in an election free of irregularities. *See Phillips v. Hechler*, 120 F. Supp. 2d 587 (2000) (filing fee restricting ballot access

denies the right to vote, requiring narrowly tailored action to achieve compelling state interest); *Dixon*, 878 F.2d at 782 (filing fee undermines the right to vote); *Gelb*, 224 F.3d at 154 (state action must intend to deprive individuals of their constitutional right to vote). The numerous cases relied on in *Dixon* also centered on voting rights. *Dixon*, 878 F.2d at 778-79; *see Bullock v. Carter*, 405 U.S. 134, 143-44, 92 S. Ct. 849, 31 L. Ed. 2d 92 (1972) (particular concern over laws directed at aspirants for office that tend to limit the field of candidates from which voters might choose); *Lubin v. Panish*, 415 U.S. 709, 716, 94 S. Ct. 1315, 39 L. Ed. 2d 702 (1974) (laws suspect if they impose restrictions on the fundamental right to vote); *Anderson*, 460 U.S. at 787-88 (exclusion of candidates burdens voters' freedom of association because the candidate serves as a rallying point for like-minded citizens).

In contrast, Crisman provides no evidence that he was denied the opportunity to campaign and fully express his views. The State placed Crisman's name on the ballot in a timely manner; his supporters could meet to assist in his campaign. And he makes no claim that Burgess' actions denied any voter the right to vote. At most, Crisman has shown that Burgess may have violated state law and helped his opponent in doing so. But he cites no authority that this amounts to a constitutional violation. As the *Gelb* court noted:

> "[W]here, as here, there exists a state law remedy to the election irregularities that is fair and adequate, human error in the conduct of elections does not rise to the level of a Fourteenth Amendment constitutional violation actionable under § 1983 in the absence of willful action by state officials intended to deprive individuals of their *constitutional right to vote*."

*Gelb*, 224 F.3d at 154 (emphasis added) (quoting *Gold v. Feinberg*, 101 F.3d 796, 800, 802 (2d Cir. 1996)).[2]

---

[2] *Gelb*, 224 F.3d at 152. The district court reasoned:

"It is difficult for this Court to perceive Mr. Gelb's grievance. He was not prevented (nor, apparently, was anyone else) from casting a write-in vote for himself in the 1993 or the 1997 general elections for Bronx Borough President.

■ ■ Finally, the Supreme Court has repeatedly cautioned federal and state courts against enlarging the "commodious" contours of § 1983 and the Fourteenth Amendment. *Davis v. Bucher*, 853 F.2d 718, 720 (9th Cir. 1988). The central mission of both § 1983 and substantive due process is to provide redress for, and deter abuse of, government authority. *Davis*, 853 F.2d at 720. The judiciary should be circumspect in expanding the substantive reach of due process if it requires redefining fundamental rights. *Davis*, 853 F.2d at 720.

In conclusion, the trial court did not err in granting summary judgment for Burgess and the Fire District. Crisman has no private claim for damages under the Public Disclosure Act; he also has not shown that he was harmed by the District's hiring of Burgess; and Burgess did not violate Crisman's constitutional right to associate with his supporters and campaign for the office.

Affirmed.

QUINN-BRINTNALL, A.C.J., and HOUGHTON, J., concur.

He was unable to cast write-in votes in the 1993 and 1997 primaries—but, in this, he was in no different position from anyone else in New York City who failed to submit opportunity to ballot petitions."

*Id.* (quoting *Gelb v. Bd. of Elections*, 71 F. Supp. 2d 259, 265 (S.D.N.Y. 1999)).