130 P.3d 352 (2006)
130 Wash.2d 352
STATE of Washington ex rel. WASHINGTON STATE PUBLIC DISCLOSURE COMMISSION, Petitioner,
v.
WASHINGTON EDUCATION ASSOCIATION, Appellant,
Gary Davenport, Martha Lofgren, Walt Pierson, Susannah Simpson, and Tracy Wolcott, Petitioners, individually and on behalf of all other nonmembers similarly situated,
v.
Washington State Education Association, Respondent.
No. 74268-5, 74316-9.
Supreme Court of Washington, En Banc.
Argued May 27, 2004.
Decided March 16, 2006.
*353 Attorney General's Office, Mr. David T. Wendel, Olympia, Steven T. O'Ban, Chad Allred, Ellis Li & McKinstry PLLC, Seattle, Attorney General's Office, Ms. Linda A. Dalton, Olympia, for Petitioner/Appellant.
Ms. Judith A. Lonnquist, Seattle, Ms. Harriet K. Strasberg, Attorney at Law, Olympia, WA Education Association, Ms. Aimee Strand Iverson, Federal Way, for Appellee/Respondent.
Donald E. Clocksin, Olympia, Robert H. Chanin, Bredhoff & Kaiser, PLLC, Richard B. Wilkof, National Educ. Ass'n, Washington, DC, for Amicus Curiae National Educ. Ass'n.
Russell Clayton Brooks, Bellevue, Deborah J. La Fetra, Sacramento, Pacific Legal Foundation, for Amicus Curiae Pacific Legal Foundation.
Edward Earl Younglove, III, Younglove Lyman & Coker PLLC, Olympia, Joaquin M. Hernandez, Seattle, for Amicus Curiae Wash. Federation of State Employees.
James D. Oswald, Law offices of James D. Oswald, Seattle, for Amicus Curiae Wash. State Labor Council.
*354 IRELAND, J.[*]
¶ 1 In these consolidated cases, we review RCW 42.17.760, which governs a labor union's ability to use agency shop fees, the fees paid by educational employees who are not union members. Both cases stem from an Evergreen Freedom Foundation (Evergreen) complaint with the Public Disclosure Commission (PDC) that the Washington Educational Association (WEA) violated RCW 42.17.760 (hereafter § 760).
¶ 2 In the first consolidated case, the trial court found that WEA had intentionally violated § 760 and assessed $590,375 in penalties and costs. The Court of Appeals reversed, holding that RCW 42.17.760 is unconstitutional. We affirm the Court of Appeals.
¶ 3 In the second consolidated case, plaintiffs contend that chapter 42.17 RCW provides them a private right of action to recover for violations of § 760. Plaintiffs also assert tort claims based on violations of § 760. The trial court agreed that § 760 provides a private right of action, but the Court of Appeals reversed because it had held § 760 unconstitutional. The Court of Appeals remanded the case for dismissal. We affirm the Court of Appeals.

FACTUAL BACKGROUND
¶ 4 WEA is the exclusive bargaining agent for approximately 70,000 Washington State educational employees. Membership in WEA is voluntary. However, both members and nonmembers must contribute to WEA for the costs related to collective bargaining.[1] Per statute, members pay dues to the union; nonmembers pay agency shop fees, which are equivalent to member dues. RCW 41.59.100[2]; RCW 41.56.122.
¶ 5 A portion of members' dues goes to support political and ideological causes, which are unrelated to the union's collective bargaining activities on behalf of all employees. These expenses are typically called nonchargeable expenses. Nonmembers who do not wish to support these nonchargeable activities may obtain a rebate of that portion of their fees that was used for nonchargeable activities. The process by which the union rebates this amount to dissenting nonmembers was established by the United States Supreme Court in Chicago Teachers Union v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).
¶ 6 Twice each year, WEA sends a "Hudson packet" to each nonmember. The Hudson packet includes a letter notifying the employee of his or her right to object to paying fees for nonchargeable expenditures. The packet gives the nonmember three choices: (1) pay agency shop fees equivalent to 100 percent of dues; (2) object to paying 100 percent and receive a rebate of nonchargeable expenditures, as calculated by WEA; or (3) object to paying 100 percent and challenge WEA's calculations of nonchargeable expenditures. The packet also provides financial information about WEA and its activities. During the years 1996 to 2000, WEA had approximately 3,500 nonmembers per year, which is approximately 5 percent of the total number of persons represented by WEA.
¶ 7 When a nonmember challenges WEA's calculation of nonchargeable expenditures, an arbitrator determines the amount of the nonmember's fees that should be rebated. Pending the outcome of the arbitration, WEA escrows any fees that are reasonably *355 in dispute. The WEA rebates to the employee the amount determined by the arbitrator, and transfers the remainder to the WEA general account. During the years 1996 to 2000, the rebates ranged from $44 to $76. Clerk's Papers (CP) at 839. Nonmembers who did not object and did not request rebates did not receive rebates. Their fees were transferred from escrow to WEA's general account. Political expenditures were made from this account pursuant to a 1996 agreement with the PDC. At issue are the fees paid by the nonobjecting nonmembers.

PROCEDURAL BACKGROUND
¶ 8 This is the latest in a series of actions by Evergreen against WEA. These cases include State ex rel. Evergreen Freedom Foundation v. Washington Education Ass'n, 140 Wash.2d 615, 999 P.2d 602 (2000) and State ex rel. Evergreen Freedom Foundation v. Washington Education Ass'n, 111 Wash.App. 586, 49 P.3d 894 (2002).
¶ 9 The current action began in August 2000, when Evergreen filed a complaint with the PDC, alleging that WEA had violated RCW 42.17.760. The complaint asserted that WEA failed to get the affirmative authorization of all nonmembers before using the nonmembers' fees for political purposes, as required by the statute. In order to avoid yet another lawsuit, WEA entered into a stipulation with the PDC. In that stipulation, WEA acknowledged that it had violated § 760 during the 1999-2000 fiscal year. The PDC referred the case to the attorney general for prosecution.
¶ 10 The State filed suit against WEA in October 2000, alleging WEA had violated § 760 during the previous five years, 1996 to 2000. Both parties moved for summary judgment. The trial court granted the PDC's motion for partial summary judgment, ruling § 760 is constitutional and it "requires affirmative authorization from agency fee payers . . . and defendant's Hudson procedures do not satisfy this requirement." CP at 349-50. The court ruled that it was a question of fact whether WEA had "used" those agency fees for political purposes. The case proceeded to a bench trial on the issue of whether the WEA had "used" for political purposes the fees of nonmembers who had failed to object by completing and returning the form contained in the Hudson packet.
¶ 11 At trial, three experts testified concerning WEA's accounting procedures and whether WEA had used the fees of the nonobjecting nonmembers. Two of the three experts, including the parties' jointly retained expert, testified that WEA had not used the fees of the nonobjecting nonmembers for political expenditures.
¶ 12 However, the trial court concluded that WEA had used those fees. The court assessed a sanction of $200,000, calculated by multiplying $25 by the approximately 4,000 nonmembers who had failed to respond to the Hudson packet. The court then doubled the fine to $400,000, as allowed by RCW 42.17.400(5). The court awarded the PDC costs and fees of $190,375 for a total judgment against WEA of $590,375. The trial court also issued a permanent injunction, precluding WEA from collecting the full amount of agency fees mandated by RCW 41.59.100 and requiring WEA to institute new procedures for segregating the amounts collected from members and the amounts collected from nonmembers.
¶ 13 WEA appealed. On appeal, Division Two of the Court of Appeals held § 760 unconstitutional because its "affirmative authorization requirement unduly burdens unions." State ex rel. Wash. State Pub. Disclosure Comm'n v. Wash. Educ. Ass'n, 117 Wash.App. 625, 640, 71 P.3d 244 (2003). The State sought review in this court.
¶ 14 The other consolidated case arose in March 2001, when several educational employees, Gary Davenport, Martha Lofgren, Walt Pierson, Susannah Simpson, and Tracy Wolcott (Davenport), who are not members of the union, filed a class action against WEA on behalf of present or former public school employees. Davenport claims a private right of action under the Public Disclosure Act (PDA). Davenport seeks a refund of that portion of agency shop fees used for political expenditures. Davenport also alleges tort claims for breach of fiduciary duty, conversion, and fraudulent concealment. The trial court dismissed the breach of fiduciary duty claim but denied dismissal of the other *356 claims. In addition, the trial court ruled that § 760 provides a private right of action. The trial court then stayed further proceedings while the parties sought interlocutory appeal. The Court of Appeals granted review. After holding § 760 unconstitutional in the consolidated case, the Court of Appeals remanded the Davenport case to the trial court for dismissal. Davenport petitioned for review in this court.
¶ 15 This court granted the State's and Davenport's petitions for review and consolidated the two cases. We affirm the Court of Appeals.

ISSUES
1. Does WEA's Hudson process satisfy RCW 42.17.760's requirement of affirmative authorization?
2. Does the requirement of affirmative authorization render RCW 42.17.760 unconstitutional?
3. Does chapter 42.17 RCW create a private right of action?

ANALYSIS

1. Does WEA's Hudson process satisfy RCW 42.17.760's requirement of affirmative authorization?
¶ 16 Enacted in 1992 as part of Initiative 134 (I-134), the Fair Campaign Practices Act, § 760 restricts the ability of unions to use for political purposes the agency fees paid by employees who have not joined the union. Laws of 1993, ch. 2, §§ 1-36. RCW 42.17.760 provides:
A labor organization may not use agency shop fees paid by an individual who is not a member of the organization to make contributions or expenditures to influence an election or to operate a political committee, unless affirmatively authorized by the individual.
WEA argues that the Hudson process satisfies the requirement of affirmative authorization because it provides each individual nonmember the opportunity to object, to obtain a refund, and to prevent fees from being used by WEA, even temporarily, for political purposes. The State contends that the plain language of the statute makes clear that each individual nonmember must provide actual consent and that failure to respond to the Hudson packet does not constitute consent.
¶ 17 Prior to this suit, no court had construed the affirmative authorization requirement of § 760. The PDC, the agency charged with implementing the PDA, had not issued any regulations interpreting § 760 or brought any enforcement actions concerning § 760. In addition, despite several requests that the PDC provide guidance to labor organizations on how to comply with § 760's affirmative authorization requirement, the PDC had not given any direction.
¶ 18 In interpreting an initiative, the court looks at the voters intent and the language of the initiative as the average informed lay voter would interpret it. In re Estate of Hitchman, 100 Wash.2d 464, 467, 670 P.2d 655 (1983). Words are given their ordinary meaning. Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs., 133 Wash.2d 894, 905, 949 P.2d 1291 (1997). If the language used is fairly susceptible to more than one interpretation, the statute is ambiguous. Sacred Heart Med. Ctr. v. Dep't of Revenue, 88 Wash.App. 632, 636, 946 P.2d 409 (1997). If the statute is ambiguous, the intent of the electorate may be ascertained from the language of the initiative as well as the official voters pamphlet. State v. Thorne, 129 Wash.2d 736, 763, 921 P.2d 514 (1996).
¶ 19 Because § 760 does not define "affirmative authorization," it is unclear whether the Hudson process satisfies the authorization requirement. The plain language seems to indicate a nonmember must provide an expression of positive authorization. Failure to respond to the Hudson packet may be considered acquiescence, but it would not fulfill the affirmative authorization requirement. The difference is that affirmative authorization seems to indicate that the member must say "yes," instead of failing to say "no."
¶ 20 In this case, the language of the voters pamphlet does not assist us because it also fails to clarify the term "affirmative authorization" and fails to identify what type of authorization was intended. Indeed, the voters pamphlet describes the requirement *357 as "individual authorization," not "affirmative authorization."
¶ 21 The State admits that § 760 does not require written authorization. We agree, otherwise the statute would have so stated. Where written authorization is required in the chapter, the statute specifies written authorization. Compare the language of § 760, which forbids the use of nonmember fees in support of political activities "unless affirmatively authorized by the individual," to the language of RCW 42.17.680(3), which forbids deducting "a portion of an employee's wages or salaries for contributions to political committees or for use as political contributions except upon written request of the employee." RCW 42.17.680(3)(emphasis added). Where different language is used in different places within a statute, it is presumed there is a difference in intent. State v. Roberts, 117 Wash.2d 576, 586, 817 P.2d 855 (1991). Therefore, not only does § 760 not require written authorization, we presume that written authorization is not what is intended.
¶ 22 At oral argument, the State was unable to specify what form of authorization would satisfy the requirement of affirmative authorization, except to say that the Hudson process was not sufficient. The State asserts that the voters intended to provide to nonmembers more protection of First Amendment rights than is provided under the Hudson process approved by the Supreme Court. However, the State has failed to provide any evidence of such intent. The single line in the voters pamphlet concerning the agency shop fees provision does not mention either the constitution or the protection of the nonmember. The voters pamphlet's only reference to the current § 760 is the comment that under I-134, "agency shop fees could not be used for political purposes without individual authorization." This bare description does not indicate what form the authorization should take or whether the Hudson process satisfies the requirement of affirmative authorization.
¶ 23 We have previously discussed the intent of the voters in passing I-134. For example, we declared that "[t]he intent of the people of this State in enacting Initiative 134 can be determined from the declarations in RCW 42.17.610 and .620." Evergreen Freedom Found. v. Wash. Educ. Ass'n, 140 Wash.2d at 637, 999 P.2d 602. Those declarations of intent indicate that the principal thrust of I-134 was to protect the integrity of the election process from the perception that elected officials are improperly influenced by monetary contributions and the perception that individuals have an insignificant role to play. Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n, 141 Wash.2d 245, 293, 4 P.3d 808 (2000) (Talmadge, J., dissenting). Thus, the intent of the statute is to protect the public, not individual employees. Crisman v. Pierce County Fire Prot. Dist. No. 21, 115 Wash.App. 16, 23, 60 P.3d 652 (2002). The requirement of individual authorization does not advance this intent any more than the Hudson process.
¶ 24 Where a statute is ambiguous and this court is able to construe it in a manner which renders it constitutional, the court is obliged to do so. State v. Dixon, 78 Wash.2d 796, 804, 479 P.2d 931 (1971). However, having construed the statute as requiring more than a nonresponse to a Hudson packet, we must next examine the constitutionality of § 760.

2. Does the requirement of affirmative authorization render RCW 42.17.760 unconstitutional?
¶ 25 A party challenging the constitutionality of a statute bears the burden of establishing its unconstitutionality beyond a reasonable doubt. State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 808, 982 P.2d 611 (1999). A statute is presumed constitutional, and all doubts are resolved in favor of constitutionality. Dixon, 78 Wash.2d at 804, 479 P.2d 931.
¶ 26 The first and fourteenth amendments to the United States Constitution protect the freedom of an individual to associate for the purpose of advancing beliefs and ideas. Abood v. Detroit Bd. of Educ., 431 U.S. 209, 233, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); Elrod v. Burns, 427 U.S. 347, 355-57, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The practice of persons banding together to make their political voices heard is deeply embedded *358 in the American political process. Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). "Its value is that by collective effort individuals can make their views known, when, individually, their voices would be faint or lost." Id.
¶ 27 The freedom to associate encompasses the freedom to contribute financially to an organization for the purpose of spreading a political message. Id. at 296, 102 S.Ct. 434. "Making a contribution ... enables like-minded persons to pool their resources in furtherance of common political goals." Buckley v. Valeo, 424 U.S. 1, 22, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Restrictions on expenditures in political campaigning "implicate fundamental First Amendment interests." Id. at 23, 96 S.Ct. 612; see also Wash. State Republican Party, 141 Wash.2d at 256, 4 P.3d 808.
¶ 28 On the other hand, equally protected is a person's right not to be compelled to support political and ideological causes with which he or she disagrees. Hurley v. Irish-American Gay, Lesbian, & Bisexual Group, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). The freedom of association includes the converse right not to be compelled to associate. Good v. Associated Students of Univ. of Wash., 86 Wash.2d 94, 100, 542 P.2d 762 (1975). Freedom of speech includes the freedom not to speak or to have one's money used to advocate ideas one opposes. Keller v. State Bar of Calif., 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). "[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." Abood, 431 U.S. at 234-35, 97 S.Ct. 1782.
¶ 29 In a series of cases, the United States Supreme Court has addressed these competing rightsthe right to freely associate for the purpose of political speech and the right to be free from forced association in the context of the political speech of labor organizations. The result is an approach which strikes a balance between those who disagree with the labor organization's political activities and those who support the political activities. The approach accommodates the dissenting nonmember by providing an easy and prompt method of registering his or her objection and recouping any portion of fees which might otherwise be used by the union for political purposes. At the same time, the approach crafted by the Court makes it simple for one who supports the political causes of the union, whether member or nonmember, to assert his or her right of association.
¶ 30 In International Association of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court considered whether a union "receiving an employee's money should be free, despite that employee's objection, to spend his money for political causes which he opposes." The Court recognized the government's interest in supporting the important role unions play in preserving workplace harmony. Compulsory dues or fees to the union were justified by the union's obligation to represent all employees, whether members or not, as well as the union's desire to avoid free-riders. Therefore, the Court affirmed the union's right to collect fees from all employees who benefit from the union's collective bargaining activities.
¶ 31 The Court held, however, that compulsory union dues may not be used to support political causes if the member disagrees with those causes. On the other hand, "the majority also has an interest in stating its views without being silenced by the dissenters." Id. at 773, 81 S.Ct. 1784.
¶ 32 The Court stated that the appropriate remedy must reconcile the majority and dissenting interests in the area of political expression, protecting both interests "to the maximum extent possible without undue impingement of one on the other," and taking into account the administrative difficulty of accommodating each group. Id. Any remedies, however, would properly be granted only to those employees who had made known to the union that they did not desire their funds to be used for political causes to which they object. "[D]issent is not to be presumedit must affirmatively be made *359 known to the union by the dissenting employee." Id. at 774, 81 S.Ct. 1784.
¶ 33 In Abood, the Court affirmed that the principles of Street applied to public employees represented by a collective bargaining agency. The Court held that the union was allowed to use members' dues for purposes other than collective bargaining, provided the money did not come from employees who objected to the causes supported. Abood, 431 U.S. at 222, 97 S.Ct. 1782. "[T]he Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." Id. at 235-36, 97 S.Ct. 1782. The Court affirmed that the burden is on the employee to make his objection known.
¶ 34 Then in Hudson and Ellis,[3] while once again affirming that the burden is on the employee to register his dissent to the union's political activities, the Court outlined the procedures that are constitutionally required to safeguard the First Amendment rights of that dissenting employee. An employee who is given a simple and convenient method of registering dissent has not been compelled to support a political cause and has not suffered a violation of his or her First Amendment rights.[4]
¶ 35 With these principles in mind, we consider the constitutionality of the restriction imposed by § 760 on the political speech of the union, its members, and its nonmembers. Regulation of First Amendment rights is always subject to exacting judicial scrutiny. Citizens Against Rent Control, 454 U.S. at 294, 102 S.Ct. 434. The State bears the burden of demonstrating that the restriction is narrowly tailored to achieve a compelling governmental interest. State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 624, 957 P.2d 691 (1998). "Such burdens are rarely met." Id.
¶ 36 Under § 760, the union is prevented from spending any portion of a nonmember's agency fees for political causes without the affirmative authorization of the nonmember. The WEA contends, and a majority at the Court of Appeals agreed, that the statute is unconstitutional because its requirement of affirmative authorization amounts to an impermissible presumption that each nonmember objects to the union's use of his or her fees for political activities. The State argues that although the Supreme Court has placed the burden on the dissenting nonmember to assert his or her First Amendment rights, it is nevertheless constitutionally permissible for § 760 to shift the burden to the union to protect the First Amendment rights of dissenting nonmembers. The Court of Appeals held that by presuming the dissent of nonmembers, § 760 upsets the balance of members' and nonmembers' constitutional rights in the context of a union's expenditures for political activities. Section 760 impermissibly shifts to the union the burden of the nonmembers' rights. This has the practical effect of inhibiting one group's political speech (the union and supporting nonmembers) for the improper purpose of increasing the speech of another group (the dissenting nonmembers).
¶ 37 A presumption of dissent violates the First Amendment rights of both members and nonmembers. The State argues that § 760 has no impact on the First Amendment rights of members because § 760 only requires the affirmative authorization of nonmembers. However, this argument denies the obvious, significant expense involved in complying with § 760. It is disingenuous to argue that § 760 has no impact on members' ability to assert their collective political voice. Campaign finance legislation can create insurmountable organizational and financial hurdles for organizations attempting to engage in political speech, rendering the legislation unconstitutional. Fed. Election *360 Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 254-55, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). The weight of the administrative burden on the union is an important consideration in resolving the balance of member and nonmember First Amendment rights. See, e.g., Waters v. Churchill, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (court should consider the cost of procedural safeguards on First Amendment rights); Grunwald v. San Bernardino City Unified Sch. Dist., 994 F.2d 1370 (9th Cir.1993) (requirements of accommodating dissenting nonmembers must be practical). Dissenters may not silence the majority by the creation of too heavy an administrative burden.
¶ 38 In this case, WEA presented evidence that the procedures required by the State's interpretation of § 760 would be extremely costly and would have a significant impact on the union's political activities. See Report of Proceedings (RP) at 175-76, 187, 203, 208. The State concedes that written permission is not required. But even without a written permission requirement, the State's position would require individual contact with each nonmember who did not respond to the Hudson packet. Therefore, we reject the State's argument that transferring the burden from the dissenting nonmember to the union would have no impact on the union's ability to assert its political voice.
¶ 39 A presumption of dissent violates the First Amendment rights of nonmembers as well. A presumption of dissent fails to respect the nonmember's First Amendment rights as "running both ways." Wagner v. Prof'l Eng'rs in Calif. Gov't, 354 F.3d 1036, 1043 (9th Cir.2004). It assumes that because an employee has not joined the union, he or she disagrees with the union's political expenditures. However, there are numerous and varied reasons why employees choose not to join a union. Leer v. Wash. Educ. Ass'n, 172 F.R.D. 439, 446-47 (W.D.Wash. 1997) (nonmembers do not have unanimity of purpose). Employees may choose to remain nonmembers for many reasons unrelated to political expression. For those nonmembers who agree with the union's political expenditures, § 760's presumption of dissent presents an unconstitutional burden on their right to associate themselves with the union on political issues. We are bound to provide at least as much protection to the union's members and nonmembers as that provided by the First Amendment: "`[S]tates have no greater power to restrain the individual freedoms protected by the First Amendment than does the Congress.'" Wash. State Republican Party, 141 Wash.2d at 264, 4 P.3d 808 (quoting Wallace v. Jaffree, 472 U.S. 38, 48-49, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)).
¶ 40 Nevertheless, the State argues that we need not adhere to the balance of First Amendment rights as articulated in Street, Abood, and their progeny.[5] The State argues that those cases are different because they do not involve a state statute that expressly calls for affirmative authorization of nonmembers. The State also places great emphasis on the fact that § 760 was enacted by the citizens of Washington. However, the voters cannot do through initiative what is constitutionally prohibited. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 204, 11 P.3d 762 (2000). In reviewing the constitutionality of a statute, it is irrelevant that a statute is enacted by the voters rather than a legislative body. Id.
¶ 41 Moreover, while our state may provide greater protection to its citizens, such as dissenting nonmembers, than is provided by the federal constitution, it cannot do so at the expense of the rights of other citizens, such as members and supporting nonmembers. The State's argument transfers the burden of asserting First Amendment rights from the dissenting nonmembers and places it on the supporting nonmembers and the union. Increased protection for nonmembers, as asserted by the State, tips the scales *361 of First Amendment rights in favor of the dissenting nonmember, while increasing the burden on the nonmember who supports the union's political causes and also on the union, which must bear the administrative costs. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." Buckley, 424 U.S. at 48-49, 96 S.Ct. 612.
¶ 42 In addition, there is no indication that in voting for I-134, the voters intended to provide more protection for nonmembers than that offered under federal constitutional principles. Rather, as we have previously stated, the principal thrust of I-134 was to protect the integrity of the election process from the perception that elected officials are improperly influenced by monetary contributions and the perception that individuals have an insignificant role to play. Wash. State Republican Party, 141 Wash.2d at 293, 4 P.3d 808. The intent of the statute was to protect the public, not individual employees. Crisman, 115 Wash.App. at 23, 60 P.3d 652 (the wording and history of chapter 42.17 RCW indicate that its goal is to protect the public); see also Nelson, 131 Wash.2d at 532, 936 P.2d 1123 ("Initiative 134 ... was aimed at repairing the political process.").
¶ 43 The Ninth Circuit engaged in a similar analysis in Mitchell v. Los Angeles Unified School District, 963 F.2d 258 (9th Cir.), cert. denied, 506 U.S. 940, 113 S.Ct. 375, 121 L.Ed.2d 287 (1992). In Mitchell, plaintiffs were nonmembers who, like the nonmembers here, failed to object to the union's use of a portion of agency shop fees for nonchargeable expenditures. The district court issued an injunction, requiring the union to obtain the affirmative consent of each individual nonmember before using that nonmember's fees for political purposes.
¶ 44 The Ninth Circuit reversed, holding that requiring an opt-in system "would unduly impede the union in order to protect `the relatively rare species' of employee who is unwilling to respond to the union's notifications but nevertheless has serious disagreements with the union's support of its political and ideological causes." Id. at 263. The court held it would be an unconstitutional burden to require all those who agree with the union's political activities to affirmatively consent. Id. The Mitchell court quoted the United States Supreme Court's statement in Street, that the union should not be sanctioned in favor of an employee who makes no complaint regarding the use of his or her money. Id. at 260. In addition, the court quoted from a California Supreme Court decision that reached the same conclusion in a similar case: "[E]ach nonmember has a right to prevent the use of his or her service fee for purposes beyond the union's representational obligations. Since ... that additional right is an aspect of the right of an employee to refuse to participate in a union's activities..., it must be affirmatively asserted or else it is waived." Id. at 262 (quoting Cumero v. Pub. Employment Relations Bd., 49 Cal.3d 575, 590, 262 Cal.Rptr. 46, 778 P.2d 174 (1989)).
¶ 45 Likewise, the Sixth Circuit held that the Supreme Court has set out a "hierarchy of interests," which places the burden on the nonmember to make his objection known. Weaver v. Univ. of Cincinnati, 970 F.2d 1523, 1532 (6th Cir.1992), cert. denied, 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993). The Weaver court stated that "[a]n `opt-in' procedure would greatly burden unions while offering only a modicum of control to nonunion employees whose procedural rights have already been safeguarded by Hudson." Id. at 1533. An opt-in provision impermissibly shifts the balance of interests underlying all of the Supreme Court's pronouncements. Id.
¶ 46 The dissent incorrectly states that the Sixth Circuit has explicitly affirmed the constitutionality of an opt-in statute similar to § 760. Dissent at 368 (citing Mich. State AFL-CIO v. Miller, 103 F.3d 1240 (6th Cir.1997)). However, the statute at issue in Miller is not similar to § 760. Washington's counterpart to the Michigan statute at issue in Miller is RCW 42.17.680(3), which we construed in one of Evergreen's previous suits against WEA. See State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n, 140 Wash.2d 615, 999 P.2d 602 (2000). The provision at issue in Miller was the Michigan statute's prohibition of reverse checkoff, a *362 collection system that automatically deducts contributions from a member's paycheck without his or her prior approval. Like the Michigan statute at issue in Miller, RCW 42.17.680(3) restricts the ability of various groups, including corporations and labor groups, from making direct deductions from an employee's wages. Miller did not involve a statute like § 760, and Miller is inapplicable to this case.[6]
¶ 47 The United States Supreme Court has held that a union has the right to use nondissenting nonmember fees for political purposes. Abood, 431 U.S. at 240, 97 S.Ct. 1782 (quoting Bhd. of Ry. & S.S. Clerks v. Allen, 373 U.S. 113, 122, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963)). The State has failed to even attempt to justify § 760, which it is required to do when regulating First Amendment rights. In fact, a restriction on the First Amendment rights of WEA must be justified by a compelling governmental interest. Here, the only interest asserted is additional protection for nonmembers' First Amendment rights. However, there is no indication or argument that WEA is compelling nonmembers to support political activities or preventing nonmembers from asserting their First Amendment rights.
¶ 48 The Supreme Court has indicated that a nonmember has a right to be free from compelled support of a political cause the nonmember does not agree with. As the Supreme Court has held, there is no compelled support if the union utilizes the Hudson procedures. Given that there is no compelled support, it does not appear that there is any governmental interference with First Amendment rights of nonmembers for § 760 to protect against. Certainly the State has not provided any evidence of a compelling governmental interest that justifies the restriction on WEA from using the fees of the nondissenting nonmembers.
¶ 49 Judge Robin J. Hunt in her dissent at the Court of Appeals opines that while "opt-in" procedures have not been found to be constitutionally required, the procedure is not constitutionally infirm. State ex rel. Pub. Disclosure Comm'n v. Wash. Educ. Ass'n, 117 Wash.App. 625, 644, 71 P.3d 244 (2003) (Hunt, J., concurring in part, dissenting in part). She argues that the cases we cite, Street, Abood, Mitchell, and others, create a constitutional floor, but not a ceiling. Even if this argument were accepted, when the State acts in a way that affects the associational and free-speech rights of individuals, in addition to having a compelling reason, its legislation must be narrowly tailored. RCW 42.17.760 is not narrowly tailored especially when examined in light of recent United State Supreme Court authority.
¶ 50 In Boy Scouts of Am. v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), the United States Supreme Court set forth the test for determining whether a government regulation improperly violates a group's right of expressive association. Because § 760 regulates the relationship between the union and agency fee payers with regard to political activity, the Boy Scouts analysis should be applied here. Under the Boy Scouts test, we must evaluate whether § 760's opt-in provision would significantly burden the union's expressive activity. Boy Scouts, 530 U.S. at 653, 120 S.Ct. 2446. If so, then we must analyze whether § 760's opt-in provision is narrowly tailored to support a compelling state interest that is unrelated to the suppression of free speech. Id. at 648, 120 S.Ct. 2446. We conclude that the union's expressive activity is significantly *363 burdened by § 760's opt-in requirement. We also conclude that any compelling state interest in protecting dissenters' rights, could be met by less restrictive means other than the § 760 opt-in procedure. The union's Hudson procedures amount to a constitutionally permissible alternative that adequately protects both the union and dissenters. Because RCW 42.17.760 is not narrowly tailored, we hold that the statute is unconstitutional.
¶ 51 The dissent complains that the narrowly tailored issue was not argued or briefed and that we should not rely on Boy Scouts. However, this is specifically argued in Respondent WEA's brief to this court. Resp't Br. at 14. That the Boy Scouts v. Dale case was not cited does not preclude this court from considering this important case. "[T]his court has the inherent discretionary authority to reach issues not briefed by the parties if those issues are necessary for decision." Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, 151 Wash.2d 203, 213, 87 P.3d 757 (2004) (quoting City of Seattle v. McCready, 123 Wash.2d 260, 269, 868 P.2d 134 (1994)). Moreover, "[T]his court has frequently recognized it is not constrained by the issues as framed by the parties if the parties ignore a constitutional mandate, a statutory commandment, or an established precedent." City of Seattle v. McCready, 123 Wash.2d 260, 269, 868 P.2d 134 (1994).
¶ 52 In 2000, the United States Supreme Court analyzed whether application of New Jersey's public accommodation law to require the Boy Scouts to admit James Dale, a homosexual gay rights activist, violated the Boy Scouts' First Amendment right of expressive association. Boy Scouts, 530 U.S. at 643, 647, 120 S.Ct. 2446. The Court noted that government actions that unconstitutionally burden a group's right of expressive association "may take many forms," one of which was forcing a group to accept certain unwanted members. Id. at 648, 120 S.Ct. 2446. The Court then applied a multistep analysis and concluded (1) that the Boy Scouts engaged in expressive activity, (2) that forced inclusion of Dale would significantly burden the Boy Scouts' expression, and (3) that application of New Jersey's public accommodations law in that case ran afoul of the Boy Scouts' constitutional freedom of expressive association. Id. at 656, 120 S.Ct. 2446.
¶ 53 While this case involves regulation of the use of agency shop fees, rather than regulation of the group's membership, the essence of RCW 42.17.760 is state regulation of the relationship between the union and agency fee payers with regard to political speech.
¶ 54 Under Boy Scouts, in order to determine whether § 760 violates the union's freedom of expressive association, we must first determine whether the union engages in expressive activity. Boy Scouts, 530 U.S. at 656, 120 S.Ct. 2446. It is clear from the record that the WEA engages in political and ideological activities not related to collective bargaining or contract administration. Moreover, § 760 specifically regulates the expenditure of agency shop fees "to influence an election or to operate a political committee." Thus, it seems indisputable that the union engages in expressive activity and § 760 regulates the union's expressive association with agency fee payers. See Boy Scouts, 530 U.S. at 650, 120 S.Ct. 2446.
¶ 55 We must next determine whether § 760 opt-in requirement, significantly burdens the union's ability to express its viewpoint. The Boy Scouts Court emphasized that courts "must also give deference to an association's view of what would impair its expression." Boy Scouts, 530 U.S. at 653, 120 S.Ct. 2446.
¶ 56 RCW 41.59.060(2) provides that if an agency shop agreement becomes effective, a fee that is equivalent to union dues will be deducted from the salary of employees in the bargaining unit. See also RCW 41.59.100 (providing for limited exceptions not at issue here). Thus, under the agency shop provisions, the union is entitled to collect a fee equivalent to 100 percent of union dues from nonmembers in the bargaining unit. RCW 41.59.100.
¶ 57 Section 760 then encumbers the use of such funds by prohibiting their expenditure for political speech absent affirmative authorization by the agency fee paying nonmember. Notably, the statute acknowledges *364 that the fees are in the union's possession but places restrictions upon the use of the union's funds for political speech. RCW 42.17.760.
¶ 58 The union's Hudson procedures protect dissenters' rights not to participate in the union's political speech. Twice a year, the union mailed a Hudson packet to agency fee payers. The packet contained detailed information about the union's expenditures and the right to object to nonchargeable expenditures. The packet offered three options. A nonmember could: (1) pay agency shop fees equal to 100 percent of union dues, (2) pay agency shop fees, but object to WEA's political expenditures and receive a rebate of nonchargeable expenditures as calculated by the union, or (3) object to the WEA's political expenditures and challenge the WEA's calculation of nonchargeable expenditures before an impartial arbitrator. RCW 42.17.760 significantly changes this process by requiring the union to forgo the use of the portion of agency fees that would go toward political expenditures unless the nonmember affirmatively authorizes use for political purposes, rather than allowing the union to use that portion of the agency fee for political speech absent objection.
¶ 59 The union contends that § 760's affirmative authorization requirement significantly burdens its expressive association with nonobjecting agency fee payers. At trial, a union expert testified that it would double the complexity of the dues collection system if fee payers were to pay a different amount than members. The union's additional efforts to attain affirmative authorization would impose further administrative burden. Even if the union were to hold the amount allocated to political activity in escrow while seeking affirmative authorization, the lack of access to those funds could impact the timeliness of the union's political speech. Given the Boy Scouts requirement that we give deference to the union's view of what would impair its political expression and given the long recognized, highly protected nature of political speech, we conclude that RCW 42.17.760 significantly burdens the union's right of expressive association. See Boy Scouts, 530 U.S. at 653, 120 S.Ct. 2446; see also Meyer v. Grant, 486 U.S. 414, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (political speech is at the core of the First Amendment freedom).
¶ 60 Finally, we must consider whether RCW 42.17.760 is narrowly tailored to support a compelling government interest that is unrelated to suppression. Boy Scouts, 530 U.S. at 648, 120 S.Ct. 2446. The protection of dissenters' First Amendment rights is a compelling interest and this interest is not rooted in a desire to suppress the union's political speech for suppression's sake. However, the federal case law previously extensively cited reveals that § 760's opt-in provision is not narrowly tailored to protect this interest. Hudson, 475 U.S. 292, 106 S.Ct. 1066; Abood, 431 U.S. 209, 97 S.Ct. 1782; Street, 367 U.S. 740, 81 S.Ct. 1784; Weaver, 970 F.2d 1523; Mitchell, 963 F.2d 258. As noted previously, the United States Supreme Court and other federal courts have concluded that a constitutionally acceptable alternative is the opt-out system previously implemented by the union. See, e.g., Street, 367 U.S. at 774, 81 S.Ct. 1784; Abood, 431 U.S. at 235-36, 97 S.Ct. 1782; Mitchell, 963 F.2d at 262-63. Even if these cases do not contain a constitutionally based prohibition against opt-in systems, they do reveal a less restrictive alternative means for protecting dissenters' rights. Under the Boy Scouts analysis, § 760 significantly burdens the union's expressive association, requiring the statute to survive strict scrutiny. See Boy Scouts, 530 U.S. at 648, 120 S.Ct. 2446. The constitutionally acceptable opt-out alternative is significant in that it reveals that protection of dissenters' rights can be achieved through means significantly less restrictive of the union's associational freedoms than RCW 42.17.760's opt-in requirement. See id.
¶ 61 In sum, RCW 42.17.760 regulates the relationship between the union and agency fee payers with regard to political expression. Therefore, we apply the framework set forth in Boy Scouts to determine whether § 760 violates the union's right of expressive association. The union engages in expressive activity and RCW 42.17.760's opt-in requirement significantly burdens the union's association with agency fee payers with regard to its political speech. Accepting the argument *365 that protection of dissenters' rights is a compelling state interest, the opt-out procedure is a less restrictive constitutionally permissible alternative. RCW 42.17.760's opt-in procedure is not narrowly tailored to advance the State's interest in protecting dissenters' rights, and thus, the statute is unconstitutional.

3. Does chapter 42.17 RCW create a private right of action?
¶ 62 Because Davenport's claims in the consolidated case are founded on an alleged violation of § 760, we do not reach either Davenport's claim that chapter 42.17 RCW implies a private right of action or Davenport's tort claims. We therefore affirm the Court of Appeals' remand of Davenport to the superior court for dismissal.

CONCLUSION
¶ 63 We hold that § 760 is unconstitutional. We affirm the Court of Appeals in each case.
C. JOHNSON, MADSEN, BRIDGE, CHAMBERS and OWENS, JJ., concur.
SANDERS, J. (dissenting).
¶ 64 That to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical.[1]
¶ 65 The majority turns the First Amendment on its head. Unions have a statutory, not constitutional, right to cause employers not only to withhold and remit membership dues but also to withhold and remit fees from nonmembers in an equivalent amount.[2] Absent this statutory mechanism for the withholding and remission of agency fees (or membership fees for that matter), there is no right, constitutional or otherwise, for the union to require it. Abood v. Detroit Bd. of Educ., 431 U.S. 209, 223, 97 S.Ct. 1782, 1793, 52 L.Ed.2d 261 (1977).
¶ 66 Many other states have markedly different statutory schemes: Some entirely bar union security agreements and outlaw agency shops as well.[3]
¶ 67 Should the legislature of the State of Washington choose to repeal the mandatory withholding provisions of RCW 41.59.060 and.100, there would be no constitutional impediment to doing so. And no party to this proceeding claims there is.
¶ 68 However the existence of these mandatory withholding statutes does raise a very definite constitutional problem insofar as the statute is used to compel the nonmember to support the political advocacy of the union *366 without his consent. Nearly every case cited by the majority concerns precisely that eventuality. However that constitutional problem can no longer arise in the state of Washington by virtue of a further statute, RCW 42.17.760, which provides in its entirety:
A labor organization may not use agency shop fees paid by an individual who is not a member of the organization to make contributions or expenditures to influence an election or to operate a political committee, unless affirmatively authorized by the individual.
¶ 69 There is nothing ambiguous about this statute. No labor organization may use agency fees for political purposes absent "affirmative authoriz[ation]" by the individual. Nonaction or acquiescence is not "affirmative authoriz[ation]."
¶ 70 Given that the legislature could constitutionally repeal the whole statutory scheme allowing withholding in the first place, I find it nearly beyond comprehension to claim that the legislature, or the people acting through their sovereign right of initiative, could not qualify these statutes to ensure their constitutional application.
¶ 71 In short, the majority turns the First Amendment on its head to invalidate a state statute enacted to further protect the constitutional rights of nonunion members who are required to pay agency fees as the price of their employment.
¶ 72 While the First Amendment protects the right to organize and to express ideas on behalf of an organization, it "does not impose any affirmative obligation on the government to listen, to respond, or ... to recognize the association and bargain with it." Smith v. Ark. State Highway Employees, 441 U.S. 463, 465, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979). See also Brown v. Alexander, 718 F.2d 1417, 1421-22 (6th Cir.1983). Following from this basic premise, there is no constitutional right to have the government deduct union dues (and, by logical extension, agency fees) from paychecks. Ark. State Highway Employees v. Kell, 628 F.2d 1099 (8th Cir. 1980).
¶ 73 "Although the loss of payroll deductions may economically burden the [union] and thereby impair its effectiveness, such a burden is not constitutionally impermissible." S.C. Educ. Ass'n v. Campbell, 883 F.2d 1251, 1256 (4th Cir.1989). "[T]he First Amendment does not impose an affirmative obligation on the state to assist the program of an association by providing payroll deduction services." Id. at 1257. The Fourth Circuit, examining whether payroll deductions were constitutionally required, quoted the United States Supreme Court, "`[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe that right."' Id. at 1256 (quoting Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). The court concluded by stating, "the state's failure to authorize payroll deductions for the [union] does not deny [union] members the right to associate, to speak, to publish, to recruit members, or to otherwise express and disseminate their views." Id. at 1257.
¶ 74 The Ohio legislature eliminated wage checkoffs for the support of any "candidate, separate segregated fund, political action committee, legislative campaign, political party, or ballot issue." Ohio Rev.Code § 3599.031(H). The United States Court of Appeals for the Sixth Circuit found this constitutional. Toledo Area AFL-CIO Council v. Pizza, 154 F.3d 307, 319-21 (6th Cir.1998).
¶ 75 Therefore, it would be perfectly constitutional if the State chose to eliminate the payroll deduction for collection of agency shop fees altogether. How then could merely placing a procedural condition on the collection of a small portion of such shop fees (those that would be used to influence an election or to operate a political committee) violate the constitution?
¶ 76 The majority chooses not to address this line of cases. Instead it distorts cases delineating the requirements protecting dissenting union members and nonmembers from having their dues used to support political activities with which they disagree to do the opposite: limit the State's ability to protect such dissenters.
¶ 77 Simply put, all of the cases cited by the majority involve claims by dissenters that certain steps were required to protect their constitutional right not to associate and not to have their money spent supporting political *367 positions with which they disagreed.[4] I cannot improve upon Judge Hunt's dissent from the case below: "[T]hese cases do not support the converse, advanced by the majority here, that an `opt-in' provision such as Washington's is constitutionally barred." State ex rel. Wash. State Pub. Disclosure Comm'n v. Wash. Educ. Ass'n, 117 Wash. App. 625, 642, 71 P.3d 244 (2003) (Hunt, J., dissenting).[5] Judge Hunt's learned dissent cogently analyzes each of the cases relied upon by the majority and reaches the correct conclusion.[6]
¶ 78 Our majority takes "dissent is not to be presumed"[7] out of the context in which it was writtenthe context of unions categorically violating the rights of dissenters. That language simply served to limit the actions a union must undertake in the absence of a statutory scheme. The holdings of all the cases cited by the majority amount to a simple proposition: the constitution requires at least an opt-out scheme to protect dissenters' rights.[8] None of these cases stand for the proposition that the constitution limits a different legislative approach to protecting dissenters' rights, including an opt-in scheme.
¶ 79 From the majority's misconstruction of the "dissent is not to be presumed" language a false "balance" requirement is invented. Other than general paeans to the right of association, the majority cites no other precedent for its holding that the "balance" between the associational rights of dissenters and nondissenters is upset by requiring one to register assent, rather than register dissent.[9] Again, if the elimination *368 of a payroll deduction does not abridge the constitutional rights of union members and nonobjecting nonmembers to associate, it is inconceivable that requiring assent as a precondition to using funds generated by a payroll deduction abridges such rights.
¶ 80 In fact, an "opt-in" legislative scheme has explicitly been constitutionally upheld. In Michigan State AFL-CIO v. Miller, 103 F.3d 1240 (6th Cir.1997), the Sixth Circuit upheld a statute that read:
"[A] labor organization may solicit or obtain contributions for a separate segregated fund . . . on an automatic basis, including but not limited to a payroll deduction plan, only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year."
Id. at 1248-1249 (quoting Mich. Comp. Laws Ann. § 169.255(6) (West 1966)).
¶ 81 The statutory scheme in Michigan prohibited labor unions from making political contributions from general funds, requiring them to maintain a "segregated" fund for such contributions. Id. at 1244. Thus, in order to solicit or obtain funds that would be used for political purposeseven from its own members, let alone nonmembersthe union had to obtain "affirmative consent" for the deduction every calendar year.
¶ 82 This is a more restrictive scheme than the Washington statute at issue since it applies to all union members while the Washington statute applies only to nonmembers.[10] But the statute mirrors Washington's in requiring "affirmative consent"substantively identical to "affirmative authorization"before using payroll deductions for political purposes. And even given the Michigan statute's broader effects in applying to union members, the Sixth Circuit stated:
[T]he suggestion that asking people to check a box once a year unduly interferes with the speech rights of those contributors borders on the frivolous.
Id. at 1253.
¶ 83 The majority's treatment of this case borders on the inexplicable. It claims that the primary issue in Miller was the equal application of the reverse checkoff to unions, corporations, non-profits, and other groups. Majority at 362 n. 6. It was nothing of the sort. The three sections of the opinion are labeled "Facts" (id. at 1243), "Intervention" (id. at 1245), and "The First Amendment and § 169.255(6)" (id. at 1248). There are no sections involving equal protection challenges.[11]
¶ 84 As Miller recognized, the suggestion that a legislative choice to protect dissenting nonmembers by requiring affirmative authorization before using their agency shop fees to influence an election or to operate a political committee violates the First Amendment to the United States Constitution "borders on the frivolous."
¶ 85 The majority claims this statute violates the First Amendment associational *369 rights of the union, citing Boy Scouts of Am. v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).
¶ 86 This argument's flaw is at its foundation: association is a two way street requiring a mutual desire to associate by all concerned. But here nonunion employees have elected not to associate. This does not violate the associated rights of the union or its members since it had no constitutional right to compel membership much less monetary support from nonmembers in the first place.
¶ 87 Moreover, this argument for unconstitutionality was never advanced by the parties and is therefore not properly considered by the court. See RAP 9.12 (limiting review of summary judgment to "evidence and issues called to the attention of the trial court"); see also Nelson v. McGoldrick, 127 Wash.2d 124, 140, 896 P.2d 1258 (1995); Simpson Tacoma Kraft Co. v. Dep't of Ecology, 119 Wash.2d 640, 649, 835 P.2d 1030 (1992) (refusing consideration of issues not raised before trial court); cf. Tiffany Family Trust Corp. v. City of Kent, 155 Wash.2d 225, 240, 119 P.3d 325 (2005) (refusing consideration of 42 U.S.C. § 1983 claim raised only in reply brief).
¶ 88 However even if it is properly before the court, it is not meritorious since this statute does not apply to union members only nonmembers who must pay agency fees because of their refusal to join the union. The right of these nonunion employees to refuse to join the union is itself protected by the First Amendment right of association as "`[f]reedom of association ... plainly presupposes a freedom not to associate.'" Boy Scouts, 530 U.S. at 648, 120 S.Ct. 2446; Good v. Associated Students of Univ. of Wash., 86 Wash.2d 94, 104, 542 P.2d 762 (1975). Boy Scouts protected the right of nonassociation. Were this statute to apply to union dues from voluntary union members, the analysis might be arguable. But it doesn't, and it isn't.
¶ 89 The majority confuses the analysis further by referring to "the union's expressive association with agency fee payers," majority at 363, and "its [union's] expressive association with nonobjecting agency fee payers." Id. at 364. But there is no association between the union and agency fee payers because by definition these individuals have refused to join (associate with) the union. The absence of membership defeats any claim that the regulation of statutorily required monetary support can possibly violate the right of union members to freely associate with one another for political advocacy. Rather it puts in jeopardy the First Amendment right of nonmembers to refuse to associate with a union which uses their money to advance a political agenda with which they might disagree. That is the concern of the First Amendment in this context, as it is the even more protective concern of RCW 42.17.760.
"Our Government has no more power to compel individuals to support union programs or union publications than it has to compel the support of political programs, employer programs or church programs. And the First Amendment, fairly construed, deprives the Government of all power to make any person pay out one single penny against his will to be used in any way to advocate doctrines or views he is against, whether economic, scientific, political, religious or any other."
Good, 86 Wash.2d at 101, 542 P.2d 762 (quoting Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 791, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (Black, J., dissenting)).
¶ 90 I dissent.
ALEXANDER, C.J., and FAIRHURST, J., concur.
NOTES
[*] Justice Faith Ireland is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] It is well settled that a union, which is obliged to act on behalf of all employees in the bargaining unit, may charge nonunion employees to bear their fair share of the costs of the representation. Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998). The dissent takes pains to point out that many states have passed so called "right to work laws" which have not been held unconstitutional. This argument is irrelevant to the issue in this case and inconsistent with "Washington's long and proud history of being a pioneer in the protection of employee rights." Drinkwitz v. Alliant Techsystems, Inc., 140 Wash.2d 291, 300, 996 P.2d 582 (2000).
[2] RCW 41.59.100 provides, in part: "If an agency shop provision is agreed to, the employer shall enforce it by deducting from the salary payments to members of the bargaining unit the dues required of membership in the bargaining representative, or, for nonmembers thereof, a fee equivalent to such dues."
[3] Ellis v. Bhd. of Ry., Airline & S.S. Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).
[4] Neither party has provided an analysis or argument to show why, in this context, the state constitutional provision protecting the rights of free speech and association should be construed more broadly than the federal provision. Therefore, we interpret the state constitutional clause coextensively with its parallel federal counterpart. Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 538, 936 P.2d 1123 (1997).
[5] Similarly, the dissent asserts that balancing members' and nonmembers' rights is a "false" requirement created by the majority, rather than an approach created by the Supreme Court. On the contrary, as other courts have recognized, "the balance of interests underlying all of the Supreme Court's pronouncements on the subject of agency shop fees" must be applied when determining the use of those fees for political purposes. Weaver, 970 F.2d at 1533; see e.g., Miller, 103 F.3d at 1253 (union's process must strike "a balance between the right to solicit political contributions and the co-equal right not to contribute").
[6] The dissent sees no distinction between Miller and the current case. However, use of agency shop fees was not at issue in Miller and Michigan does not have a statute that specifically applies only to agency shop fees. Furthermore, we note that the primary issue in Miller concerned applying to unions the statutory restrictions against reverse checkoff, which were already applied to corporations, nonprofits, and other groups. The Miller court held that the Michigan statute "applies evenhandedly" to unions, corporations, and other entities. Miller, 103 F.3d at 1251. The parties have not raised, and we do not address, any argument concerning § 760's application solely to labor organizations while nonprofit, corporate, and other groups are not similarly subject to affirmative authorization requirements. See Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (statute that restricts corporate political expenditures, but not labor organization's political expenditures, was justified, in part, by ability of fee payer to avoid paying for political activities of a labor organization whereas shareholders cannot dissociate themselves from corporation's political activities).
[1] Thomas Jefferson, Religious Liberty Guaranteed: Bill for Establishing Religious Freedom, 1779, in A DOCUMENTARY HISTORY OF RELIGION IN AMERICA 231 (Edwin S. Gaustad ed., 3d ed.2003) (emphasis omitted).
[2] RCW 41.59.060(2) ("If an agency shop provision is agreed to and becomes effective pursuant to RCW 41.59.100, except as provided in that section, the agency fee equal to the fees and dues required of membership in the exclusive bargaining representative shall be deducted from the salary of employees in the bargaining unit."); RCW 41.59.100 ("A collective bargaining agreement may include union security provisions including an agency shop .... If an agency shop provision is agreed to, the employer shall enforce it by deducting from the salary payments to members of the bargaining unit the dues required of membership in the bargaining representative, or, for nonmembers thereof, a fee equivalent to such dues....").
[3] See Ala.Code §§ 25-7-6, 25-7-30 to 25-7-36 (Supp.1992); Ariz.Rev.Stat. Ann. Const. art. XXV (West 1984) and §§ 23-1301 to 23-1303 (West 1995); Ark.Code Ann. §§ 11-3-301 to 11-3-304 (Michie Supp.1996); Fla. Stat. Ann. Const. art. 1, § 6 (West 1991); Ga.Code Ann. §§ 34-6-20 to 34-6-28 (1998); Idaho Code Ann. §§ 44-2001 to 44-2012 (1997); Iowa Code Ann. §§ 731.1 to 731.5 (West 1993); Kan. Stat. Ann. Const. art. 15, § 12 (1988); La.Rev.Stat. Ann. §§ 23:981 to 23:985 (West 1998); Miss.Code Ann. § 71-1-47 (1995); Neb.Rev.Stat. Const. art. XV, § 13 (1995); Nev.Rev.Stat. Ann. §§ 613.230 to 613.300 (Michie 1996); N.C. Gen.Stat. §§ 95-78 to 95-84 (1997); N.D. Cent.Code §§ 34-01-14, 34-08-04 (1987); S.C.Code Ann. §§ 41-7-10 to 41-7-90 (Law Co-op.1986); S.D. Codified Laws Const. art. VI, § 2 (Michie 1978) and §§ 60-8-3 to 60-8-8 (Michie 1993); Tenn.Code Ann. §§ 50-1-201 to 50-1-204 (1991); Tex. Lab. Code Ann. §§ 101.051 to 101.053 (West 1996); Utah Code Ann. §§ 34-34-01 to 34-34-17 (1997); Va.Code Ann. §§ 40.1-58 to 40.1-69 (Michie 1994); Wyo. Stat. Ann. §§ 27-7-108 to 27-7-115 (Michie 1997). Thirteen of these states outlaw agency shops as well as union shops. There is no indication that any state has been held to have violated union members' rights by foreclosing mandatory collection of fees from nonmembers.
[4] Mitchell v. Los Angeles Unified School District, 963 F.2d 258 (9th Cir.1992) is no different. That case concerned the First Amendment right of nonunion employees to withhold financial support from union political activity. The court held the constitutional right of the nonunion employees was adequately protected by an opportunity to "opt-out" of full dues payment through an agency fee. The constitutional rights of the union were never at issue.
[5] See also IRVING M. COPI & CARL COHEN, INTRODUCTION TO LOGIC 219-20 (9th ed.1994) (converse of a given proposition not necessarily valid).
[6] See State ex rel. Wash. State Pub. Disclosure Comm'n, 117 Wash.App. at 642-44, 71 P.3d 244 (Hunt, J., dissenting), analyzing Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Bhd. of Ry. & S.S. Clerks v. Allen, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); Abood, 431 U.S. 209, 97 S.Ct. 1782; Ellis v. Bhd. of Ry., 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); Mitchell, 963 F.2d 258. While Judge Hunt did not examine Weaver v. University of Cincinnati, 970 F.2d 1523 (6th Cir. 1992), that case arose in the identical context to the others: a claim that certain procedures, such as affirmative consent, were constitutionally required to protect dissenters' rights. See Weaver, 970 F.2d at 1531. All of these cases dealt with the constitution a floora minimum level of process needed to protect dissenters' rights. None of these cases dealt with the constitution as a ceiling limiting the discretion of legislators, or the people acting as legislators, in providing further protection to dissenters.
[7] Street, 367 U.S. at 774, 81 S.Ct. 1784; Abood, 431 U.S. at 238, 97 S.Ct. 1782.
[8] Even the language quoted by Justice Ireland demonstrates this: "`[T]he Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object.'" Majority at 359 (quoting Abood, 431 U.S. at 235-36, 97 S.Ct. 1782) (emphasis added). Further, Abood was a plurality opinion, and the concurring justices either explicitly chose not to address alternative remedies for the violations of dissenters' rights, remedies such as RCW 42.17.760 (see Abood, 431 U.S. at 244, 97 S.Ct. 1782 (Stevens, J., concurring)), or explicitly stated that the constitution does not require employees to "declare their opposition to the union and initiate a proceeding" in order to vindicate their First Amendment rights. Abood, 431 U.S. at 245, 97 S.Ct. 1782 (Powell, J., concurring).
[9] And even the cases cited as interpreting the "presumption of dissent" are misrepresented. Wagner v. Professional Engineers in California Government, 354 F.3d 1036, 1043 (9th Cir.2004) is cited for the proposition that "[a] presumption of dissent fails to respect the nonmember's First Amendment rights as `running both ways.'" Majority at 360 (quoting Wagner, 354 F.3d at 1043). Yet the issue discussed in that section of Wagner was whether the proper remedy for an inadequate Hudson notice (where no statutory scheme required assent prior to use) was return of the nonchargeable amounts to all fee payers, including those who did not object, or whether the proper remedy was a new, proper notice with a renewed opportunity to object and then to receive a refund with interest. The case had nothing to do with whether requiring assent prior to use of nonobjecting nonmembers' payroll deductions was constitutional. Indeed, the case stresses protection of dissenters in absence of a statutory scheme protecting them: "The fundamental right at issue is the right to be informed before making a choice whether to pay for non-chargeable expenditures." Wagner, 354 F.3d at 1043.
[10] The majority's attempt to distinguish Miller on the basis that Washington has a statute, RCW 42.17.680(3), limiting union members' payroll deductions is baffling. The fact that Washington also has a statute regulating union member payroll deductions (though in a different manner than Michigan's) doesn't affect the central premise of Millerthat an "opt-in" system regarding payroll deductions does not violate the First Amendment.
[11] The challenge in Miller was to both associational and speech rights. Miller, 103 F.3d at 1250. Similarly, the majority frames the issue in both political speech and associational terms. Majority at 357. But while the majority chooses to focus on the line of United States Supreme Court cases concerning associational (and nonassociational) rights, the Sixth Circuit focused on the free speech cases. Under that line of cases, the Sixth Circuit looked at whether the requirement of affirmative consent for a payroll deduction was a content-neutral restriction on the potential speech of union members who would have been funded by the payroll deduction. Id. at 1250-53. The majority determined that the restriction on speech was content-neutral, and in making that determination the court examined whether the statute was an invidious "attempt to limit contributions made to separate segregated funds or to favor one class of voters over another." Id. at 1251. The court determined that there was no invidious purpose because the "statute applies evenhandedly." Id. I of course agree that there is no violation of free speech rights in limiting a payroll deduction system and of course no violation of associational rights, as outlined above.